Edwin K. SMITH, Appellant,

v.

UNITED STATES, Appellee.

No. 06–CF–243.

District of Columbia Court of Appeals.

Argued Sept. 26, 2008.
Decided Feb. 26, 2009.
As Amended on Rehearing May 14, 2009.

Nina Chernoff, Public Defender Service,
with whom James Klein, Sandra K. Levick,

and Cortney Lollar were on the brief, for appellant.

Patricia A. Heffernan, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Thomas J. Tourish, Jr. and John C. Einstman, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, BLACKBURNE–RIGSBY, and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

On October 27, 2005, a jury convicted Edwin K. Smith of carrying a pistol without a license (CPWL), possession of an unregistered firearm (UF), unlawful possession of ammunition (UA), and unlawful possession of a controlled substance (crack cocaine).[1] Smith appeals on two grounds. First, he argues that the trial court committed clear error in rejecting his *Batson*[2] challenge to the prosecutor's use of peremptory strikes during jury selection, permitting the government to strike African–American venirepersons on account of their race. Second, Smith contends that a violation of the Sixth Amendment Confrontation Clause-the allowance of testimony about the so-called "DEA–7" drug analysis without the Drug Enforcement Administration chemist having testified and been subject to cross-examination-requires reversal of both his drug and weapons convictions.

We conclude that the trial judge did not fail to conduct an adequate inquiry or otherwise cleary err with respect to Smith's *Batson* challenge, and thus we reject

Smith's first basis for appeal. We agree with Smith that the Confrontation Clause violation requires reversal of his cocaine-possession conviction (rather than, as the government urges, remand for entry of a judgment of conviction on the lesser-included offense of attempted possession). We are persuaded, however, that the Confrontation Clause violation was harmless beyond a reasonable doubt as to Smith's weapons convictions, and therefore we affirm those convictions.

### I.   The *Batson* Issue

We begin with our review of Smith's *Batson* challenge, recognizing that he would be entitled to reversal of all his convictions if the record establishes that race was a consideration in the prosecutor's decision to strike even one African–American juror. *See Snyder v. Louisiana,* —— U.S. ——, 128 S.Ct. 1203, 1208, 170 L.Ed.2d 175 (2008) ("[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose") (quoting *United States v. Vasquez–Lopez,* 22 F.3d 900, 902 (9th Cir.1994)); (Edward) *Robinson v. United States,* 890 A.2d 674, 679–80 (D.C.2006) ("the erroneous rejection of a *Batson* challenge results in a 'structural defect' that infects 'the entire conduct of the trial from beginning to end' and hence is per se reversible") (quoting *Arizona v. Fulminante,* 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). Our task requires careful scrutiny of the record, because we must be guided by the principle that "race is an impermissible factor, even if a minor one, in exercising peremptory strikes." *Tursio v. United States,* 634

---

1. *See* D.C.Code §§ 22–4504(a), 7–2502.01, 7–2506.01(3), and 48–904.01(d) (2001).

2. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson,* the Supreme Court held that the government's

"privilege to strike individual jurors through peremptory challenges [ ] is subject to the commands of the Equal Protection Clause." *Id.* at 89, 106 S.Ct. 1712.

A.2d 1205, 1213 n. 7 (D.C.1993).[3] Accordingly, we describe the *Batson* proceedings—in particular, the reasons that the prosecutor proffered for his strikes, defense counsel's response, and the trial court's evaluation—in some detail.

## A. Jury Selection

The *Batson* issue arose on the first day of trial, after the prosecutor had exercised six of his peremptory strikes, when defense counsel told the court that "all of [the prosecutor's] strikes are African–American." The trial judge, the Honorable Judith Retchin, responded that given "what appears to be a pattern, I am going to ask the Government to justify each of the strikes noted."[4] The prosecutor then offered reasons for several of the strikes. He explained that he struck Juror 478, an unemployed custodian, because "I noticed that he had earring holes in his left ear.... I didn't gather from talking with him ... that he was particularly intelligent. That's the reason why I struck him." Judge Retchin responded, "Your next strike?"

As to Juror 372, a paralegal specialist for the Drug Enforcement Agency ("DEA"), the prosecutor explained that he "got the impression" that she "was coming across as hostile when she was talking to me." When the court asked, "How so?," the prosecutor explained, "Just the looks she gave me. That's what I wrote down here." Judge Retchin asked defense counsel whether he had noticed any hostility and he responded, "No, Your Honor." The judge said, "Nor did I," but added

that, "she did seem a bit abrupt. I can't say it's hostility, but that might be your perception." When defense counsel interjected that Juror 372 "was very, very appropriate in terms of her answers," the judge said again, "She was abrupt to the prosecutor." The judge then told the prosecutor to "[g]o ahead" with his explanations.

The prosecutor's next explanation was about Juror 774, who he observed was a "teacher doing social studies."[5] The prosecutor explained that "I just felt as though he gave [defense counsel] good eye contact. I didn't think he responded very well to me. I wrote down here that he was kind of scary." Defense counsel interjected that in his opinion, Juror 774 was "[v]ery gentle and very humble." When the prosecutor responded that "I'm basing this ... on my perception," the court stated, "if I discredit anything you say, that person is going to be seated." When the court further stated, "I did not perceive that" the prosecutor continued his explanation by saying, "when they first walk up, the first note I make is eye contact; who they are making eye contact with. If he's making eye contact with [defense counsel] as he walks up, instead of me, I take that as a partial negative situation." The court commented that the two counsel "seem to be in some contest to try to outtalk each other during voir dire."

The court then asked the prosecutor to again state for the record the basis for each of his strikes. The prosecutor resumed his explanation as to Juror 774,

---

**3.** *See also* (Leon) *Robinson v. United States,* 878 A.2d 1273, 1284 (D.C.2005) ("A peremptory challenge may not be based even partially on an unlawful discriminatory reason").

**4.** The court later explained, "the reason I granted Counsel's request to have the government explain was because every strike the

Government exercised was against an African–American."

**5.** During voir dire, Juror 774 told the court that he had recently begun work as a part-time substitute teacher after retiring from the Postal Service, and that his "specialty is social studies."

saying that "I believe he gave [defense counsel] good eye contact. He did not give me the same eye contact that he gave [defense counsel]. I felt like he was pro-defense in the way he spoke." The prosecutor added that he thought that because Juror 774 teaches social studies, "that he may be more interested in doing things that are more to the left of center, if you will, with regard to feeling like the kid needs another chance. I need to have people here who are going to ... not take into consideration social things outside of the Court's instructions...."

Moving to Juror 524, the prosecutor explained that he is "young, unemployed. I didn't really understand much of what he was saying."[6] The court responded, "Your next one?"

The prosecutor then offered his explanation as to Juror 895, stating that he struck this juror because, "He had seizures and had been robbed several times. I felt as though he wasn't the brightest light in the courtroom.... I wanted somebody here that was going to be able to listen to the instructions, follow the Court's instructions."[7] The court again responded, "Your next one?"

When the court asked the prosecutor to proceed with his next explanation, he referred to Juror 542, a flight attendant, and explained that, "I felt as though she also gave [defense counsel] good eye contact, and I put down here, 'The willies.'" The prosecutor further explained that defense counsel "talked to her for quite some time. She seemed as though she was really already buying what [defense counsel] is

selling." The prosecutor continued, "I felt as though they had established, again, with the extensive questionings by defense counsel, there had been a rapport already established to where—and I did not ask any questions. If you notice, [defense counsel] would start off his questions and a lot of these witnesses—." The court responded that both counsel "were chomping at the bit to be the first one to question on most of them. I don't know how the court reporter could capture how the two of you seemed to be competing during voir dire."

When the prosecutor completed his remarks about the six stricken jurors, the court said, "I'm not going to make a *Batson* finding against you at this time. I'm not able to determine whether you perceived that they made better eye contact with Mr. Williamson or had a relationship to Mr. Williamson superior to yours." The court told counsel to continue with jury selection, deferring her *Batson* ruling, but telling counsel to "be on notice."[8] Defense counsel then told the court that he felt "compelled to respond" to some of the prosecutor's assertions. He told the court that he had asked only a single question of Juror 542. When Judge Retchin said, "I don't think it was a single question" defense counsel said, "if it was anything else, it would have been with reference to having lived in the area, whether or not she had been active in the community, that sort of thing." Defense counsel added that, "[t]he eye contact does not bring about a basis to strike someone...." The court reiterated that, "I'm not able to make a *Batson* finding against Counsel at

**6.** Juror 524 was a recent high school graduate who was looking for work and had previously been employed at Auto Zone.

**7.** During voir dire, Juror 895 had told the court that he had seizures every few years but had not had one in two years. He also told the court that he had been robbed a couple of

times at gunpoint, had previously driven a taxicab, and was a custodian who worked "in the Navy Yard with Melwood."

**8.** The transcript actually says "But beyond notice."

this time, given that you both, you [defense counsel] in particular, were having engaged conversations with people. And the prosecutor may legitimately find that you were using that to develop a rapport with the juror. So I'm not able to make a *Batson* finding based on that."

As jury selection thereafter continued, the prosecutor exercised his next three strikes, one against a Latina and two against Jurors 013 and 838, both African–American venirepersons. Defense counsel renewed his *Batson* motion, telling the court that he "distinctly remember[ed] the exchange between Juror Number 013 and him at the bench." The prosecutor responded that Juror 013, a BMW salesman, "seemed to be kind of a smart alec" and "offered to sell Your Honor a car, which I thought was not particularly appropriate for this setting." Defense counsel interjected that this "was a joke that we all laughed at." Confirming that Juror 013 "offered to sell me a car," a comment that "was inappropriate," Judge Retchin said, "I'm not going to make a *Batson* finding, given the exchange that the juror had here." The court did not ask the prosecutor about, and the prosecutor did not offer an explanation as to, Juror 838.

The prosecutor went on to strike Juror 034, a retired Office of Personnel Management secretary, who would have been an alternate petit juror.

When the strikes had concluded, the court revisited Juror 774, telling the prosecutor, "I would like you to articulate what goes into your description of him as scary." The prosecutor explained that he wrote "scary" down as shorthand. He explained that he "got a bad impression from [Juror 774] in terms of the way he was speaking.... [H]e had a kind of strange look to his face," and "was smiling at a

time when it's not particularly appropriate to be smiling.... [W]hen I see that, I wonder ... about [the] individuals' psychological makeup, whether they have any issues that they're dealing with." Defense counsel responded that Juror 774 appeared as "a humble individual who did take these proceedings seriously," adding that "what is gleaned from a smile is simply that the man is humble." Defense counsel added that there "was nothing sort of scary or untoward, or nothing about [Juror 774's] gait that indicated any sort of mental illness, as [the prosecutor] is hinting at." Judge Retchin responded, "I don't know if [the prosecutor] was hinting at that at all."

Judge Retchin then said "it's so uncomfortable to be in this position, because I don't know what is truly in [the prosecutor's mind]. He says what he says...." She told the prosecutor, "I have no idea whether or not you have a biased bone in your body or whether race was a factor at all. You say it was not. I did not get the same feeling from Juror 774. I didn't find him scary, so to speak. You used the word, 'scary,' and I wanted to make sure his race was not a factor in your finding him scary."

The following morning, the court invited counsel to "add anything else to the record" in regard to the *Batson* challenge. The prosecutor assured the court that race was not a factor in the government's strikes and pointed out that the defense had used eight of its ten strikes against white jurors.[9] Defense counsel reminded the court that the government had used all but one of its strikes against African–Americans. Defense counsel then stated, "the reasons offered by the Government for striking the numerous African–Ameri-

9. The prosecutor did not use his tenth strike, believing incorrectly that he could save it and use two strikes (instead of only one) against prospective alternate jurors.

cans, one of which—the reasons offered was that they simply did not appear intelligent.... Counsel himself is offended by that characterization, as an African–American. The comment was certainly improper and unprofessional ... [T]hat was not a sufficient basis to remove the ... inference that the reason for the strike was racially motivated." The prosecutor responded that there were four African–Americans that he "picked thumbs-up," including a business owner whom he wanted on the jury because "he's an individual who I deem is going to be listening to the evidence and weigh it independently." He explained that he made strikes of jurors who "might not be intelligent" not because of race, but because "I did not think that [they] would be able to comprehend ... and weigh all the evidence ... impartially."

After counsel completed their remarks, Judge Retchin concluded:

I understand that the prosecutor was not using the word 'intelligence' as a code word for race. I understood the prosecutor was explaining that that particular juror was not sophisticated or educated in the way he would hope a juror might be.

Counsel, let me also say that the issue here is whether the prosecutor used race as a factor in striking jurors.

And during the voir dire, I allowed Counsel considerable leeway in following up with the jury. And actually, the two of you frustrated me to the lengths you went in asking what I thought were often irrelevant questions. But I thought the two of you were doing that, in a way, to outdo each other, so to speak, to develop a rapport with jurors. The court record cannot reflect how the two of you often spoke simultaneously at the beginning, and I'm sure that court reporter would just capture who was the more persistent in taking down what was being said. But I would say close to a dozen times, the two of you began speaking simultaneously to capture the juror's attention when the juror came to the bench.

So the dynamics of voir dire was something of note in this case. It was not a sterile gleaning of information from people, but the two of you certainly got into—I don't want to call it a horse and pony show, but there was energy at the bench, with the language and the body positioning, and all the times I had to ask [defense counsel] to please talk into the microphone because he was engaging in one-on-one with the juror, turning his back to the Court.

And so voir dire here was a contest in some respects. The prosecutor said that from that contest, he was able to determine that ... certain jurors engaged more with [defense counsel], and explains that was his reason for striking certain jurors.

I am not able to discredit the prosecutor's non-race basis explanation. I don't have any reason to question what Mr. Einstman says was his reasons or making the strikes he made, in light of how the voir dire was conducted here I don't have any reason to question what Mr. Einstman says was his reasons or making the strikes he made, in light of how the voir dire was conducted here.... [F]or the reasons stated, I do not find a *Batson* violation in this case.

## B. The Legal Framework

In *Batson*, the Supreme Court held that a prosecutor may not use peremptory strikes to eliminate would-be members of the petit jury on the basis of their race. *Batson, supra,* 476 U.S. at 89, 106 S.Ct. 1712. *Batson* and its progeny prescribe a three-part process for determining wheth-

er such discrimination has occurred. *See id.,* 476 U.S. at 94–98, 106 S.Ct. 1712; *see also, e.g.,* (Leon) *Robinson, supra,* 878 A.2d at 1282. First, the defendant must assert a prima facie case of discrimination by "showing that the totality of relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California,* 545 U.S. 162, 168, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) (quoting *Batson,* 476 U.S. at 93–94, 106 S.Ct. 1712); *see also* (Leon) *Robinson,* 878 A.2d at 1282.

Second, if the defendant makes the threshold showing, "the burden shifts to the [government] to come forward with a neutral explanation" that is "related to the particular case to be tried." *Batson,* 476 U.S. at 97, 98, 106 S.Ct. 1712. The prosecutor's explanation "need not rise to the level justifying exercise of a challenge for cause," *id.* at 97, 106 S.Ct. 1712, and the "second step of this process does not demand an explanation that is persuasive or even plausible." *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). But the prosecutor must offer a "clear and reasonably specific explanation of his legitimate reasons" for striking the juror in question. (Leon) *Robinson,* 878 A.2d at 1282.[10] "If the Government satisfies this requirement, the burden shifts back to the defendant to prove that the explanation given is a pretext for discrimination." *United States v. Farrior,* 535 F.3d 210, 221 (4th Cir.2008); *see also Molovinsky v. Fair Empl. Council of Greater Wash.,* 683 A.2d 142, 149 (D.C. 1996) (explaining that, under *Batson,* "[i]f such a reason is shown, the burden shifts back to the party claiming a violation, who must then show that the strike was moti-

vated by intentional discrimination"); *Rice v. Collins,* 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) ("the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike") (citation omitted).

As the final step in the *Batson* inquiry, "in light of the parties' submissions, the trial judge must determine whether the defendant has shown purposeful discrimination." *Miller–El v. Cockrell,* 537 U.S. 322, 328–29, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (*"Miller–El I"*). The court must "determine whether the defendant has carried his burden of proving purposeful discrimination." *Rice, supra,* 546 U.S. at 338, 126 S.Ct. 969 (citing *Batson,* 476 U.S. at 98, 106 S.Ct. 1712). This final step involves evaluating the "genuineness" of the prosecutor's asserted non-racial motive rather than the reasonableness of the professed motive. *Purkett, supra,* 514 U.S. at 769, 115 S.Ct. 1769; *see also Lamon v. Boatwright,* 467 F.3d 1097, 1101 (7th Cir.2006) (*"Batson* and its progeny direct trial judges to assess the *honesty—* not the accuracy—of a proffered race-neutral explanation"). The trial court's duty is to "undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson,* 476 U.S. at 93, 106 S.Ct. 1712 (citation omitted); *Tursio, supra,* 634 A.2d at 1211. The trial court must assess the plausibility of the prosecutor's reason for striking a juror "in light of all evidence with a bearing on it." *Miller–El v. Dretke,* 545 U.S. 231, 251–52, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (*"Miller–El II"*); *see also Johnson, supra,* 545 U.S. at 170, 125 S.Ct.

---

10. *See also Purkett, supra,* 514 U.S. at 769, 115 S.Ct. 1769 (noting that the "clear and reasonably specific" explanation that the prosecutor must give to satisfy his burden at *Batson* stage two "is not a reason that makes sense, but a reason that does not deny equal protection," and concluding that an explana-

tion that a stricken juror "had long, unkempt hair, a mustache, and a beard ... is race neutral and satisfies the prosecution's step two burden of articulating a nondiscriminatory reason for the strike") (citations and internal quotation marks omitted).

2410 ("we assumed in *Batson* that the trial judge would have the benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated"). Nevertheless, the trial judge "need not make detailed findings addressing all the evidence before it," and its failure to do so "does not diminish [the] significance" of the evidence.[11] *Miller–El I, supra,* 537 U.S. at 347, 123 S.Ct. 1029; *Smulls v. Roper,* 535 F.3d 853, 861 (8th Cir.2008) ("federal law has never required explicit fact-findings following a *Batson* challenge"); *Guzman v. Duncan,* 74 Fed. Appx. 76, 79 (2d Cir.2003) ("The Supreme Court has held that *Batson* rulings do not require a detailed explanation").

Ultimately, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible." *Miller–El I,* 537 U.S. at 339, 123 S.Ct. 1029; *see also id.* at 338–39, 123 S.Ct. 1029 (the "critical question . . . is the persuasiveness of the prosecutor's justification for the peremptory strike"); *Tursio,* 634 A.2d at 1210 (D.C.1993). Because the trial court's task at this third step will "involve [ ] an evaluation of the prosecutor's credibility, the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." *Snyder, supra,* 128 S.Ct. at 1208 (explaining that "the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor") (citation and internal quotation marks omitted).[12]

"[I]n reviewing a ruling claimed to be *Batson* error, all of the circumstances that

---

**11.** This point—*i.e.,* that the trial court need not explain every factor that supports its resolution of the *Batson* challenge—is underscored by the Supreme Court's plurality opinion in *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), in which the Court reviewed the New York courts' rulings on Hernandez's claim that the prosecutor used his peremptory challenges to exclude Latinos from the jury. The trial judge had explained his rejection of the *Batson* challenge by referring to the prosecutor's explanation that he "remove[d] these jurors . . . because even though they said they could listen to what the interpreter said and not let their own evaluation of what the witness says be the answer that they would utilize," he had "grave doubts." *People v. Hernandez,* 75 N.Y.2d 350, 553 N.Y.S.2d 85, 552 N.E.2d 621, 622 (1990). The Supreme Court plurality concluded that the "trial court did not commit clear error in choosing to believe the reasons given by the prosecutor." *Hernandez v. New York,* 500 U.S. at 372, 111 S.Ct. 1859. The Justices explained:

> Apart from the prosecutor's demeanor, which of course we have no opportunity to review, the court *could have relied on the facts* that the prosecutor defended his use of peremptory challenges without being asked

to do so by the judge, that he did not know which jurors were Latinos, and that the ethnicity of the victims and prosecution witnesses tended to undercut any motive to exclude Latinos from the jury. Any of these factors *could be taken* as evidence of the prosecutor's sincerity. The trial court, moreover, *could rely* on the fact that only three challenged jurors can with confidence be identified as Latinos, and that the prosecutor had a verifiable and legitimate explanation for two of those challenges.

*Hernandez v. New York,* 500 U.S. at 369–70, 111 S.Ct. 1859 (italics added).

**12.** At the third step of the *Batson* inquiry, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller–El II,* 545 U.S. at 241, 125 S.Ct. 2317; *see also Snyder,* 128 S.Ct. at 1211; *Capitol Hill Hosp. v. Baucom,* 697 A.2d 760, 765–66 (D.C.1997) (Ruiz, J., concurring); *Tursio,* 634 A.2d at 1212.

bear upon the issue of racial animosity must be consulted." *Id.*, 128 S.Ct. at 1208. Thus, as a reviewing court, we must evaluate the government's proffered reasons for striking jurors in light of the entire record on appeal and in light of matters of common knowledge.[13] *See id.*, 128 S.Ct. at 1210 (evaluating the plausibility of the prosecutor's explanation, that he struck a prospective juror because the juror expressed concern about missing time from his student teaching, in light of the fact that the trial and the penalty phase proceeding ultimately lasted only a few days) and at 1211 (reasoning that "although the record [does] not include the academic calendar" of the stricken juror's university, it was "apparent that the trial occurred relatively early in the fall semester," leaving the prospective juror "many weeks remaining in the term" "to compensate for the time he would have lost to jury service"); *see also People v. Davis*, 164 Cal. App.4th 305, 78 Cal.Rptr.3d 809, 817 (2008) (trial court did not make an explicit finding as to the juror's demeanor, but reversal was not required because the juror's demeanor was shown on the record from her lateness and inability to follow the court's instructions).

We have recognized that "unless the trial court rigorously scrutinizes the prosecutor's race-neutral explanations, *Batson's* promise of eliminating racial discrimination in jury selection will be an empty one." *Tursio*, 634 A.2d at 1211; *see also Jefferson v. United States*, 631 A.2d 13, 15 (D.C.1993) ("An assertion by counsel that the government is acting in a racially discriminatory manner ... demands the closest possible scrutiny by ... the trial court"). One factor the court must consider is the "strength of the prima facie showing of discrimination." *See Tursio*, 634 A.2d at 1212; *see also id.* at 1213 ("Appellant's prima facie showing of discrimination ... was so compelling that the trial court should have probed the prosecutor in detail about his different treatment of similarly situated jurors"). Greater scrutiny is required when the case is racially charged (for example, involves a victim of one race and stricken jurors of a different race),

---

The trial judge can also infer the presence of racial discrimination from a variety of other circumstances, such as where (1) the prosecutor has misrepresented a juror's response in justifying a particular strike; (2) the prosecutor failed "to engage in any meaningful voir dire examination on a subject the [prosecutor] alleges it is concerned about;" (3) a stricken juror is, aside from his race, strategically "ideal" for the state; (4) the defendant has presented a strong prima facie case, such as by pointing to the racially-charged nature of the prosecution; (5) there is a disparity in the difficulty of the questions that the prosecutor asked potential black jurors, as compared to white jurors; or (6) there is evidence that the prosecutor's office has a policy of "systematically excluding blacks from juries." *Miller–El II*, 545 U.S. at 240–41, 245–47, 255, 265, 125 S.Ct. 2317; *see also Tursio*, 634 A.2d at 1210.

**13.** At the same time, a *Batson* challenge "does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up to be false." *Miller–El II*, 545 U.S. at 252, 125 S.Ct. 2317; *see also Johnson*, 545 U.S. at 172, 125 S.Ct. 2410 ("It does not matter that the prosecutor might have had good reasons ... what matters is the real reason they were stricken") (internal punctuation omitted), *cited in* (Leon) *Robinson*, 878 A.2d at 1283 n. 20; *Williams v. Runnels*, 432 F.3d 1102, 1108 (9th Cir.2006) (the fact that the "record would support race-neutral reasons for the questioned challenges" does not justify finding that the prosecutor did not discriminate if he did not cite those reasons); *Tursio*, 634 A.2d at 1212 (invalidating the trial court's finding of no discrimination and noting that "the prosecutor never ma[de] th[e] argument" on which the trial court relied).

and when "prospective jurors of several races who appear to be similarly situated—based on their answers during questions during voir dire—are accepted or rejected for jury service by apparent reference to race." *Tursio,* 634 A.2d at 1211; *see also Evans v. United States,* 682 A.2d 644, 650 (D.C.1996) ("we apply closer scrutiny to a claim of race discrimination in the exercise of peremptory challenges in a case that is racially charged"). Scrutiny of a prosecutor's explanations that "focus upon a venireperson's body language or demeanor" is also especially important. *Tursio,* 634 A.2d at 1213 n. 7 (citation and internal quotation marks omitted). At the same time, "deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike." *Snyder,* 128 S.Ct. at 1209.

Because a trial judge's *Batson* findings "largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712; *see also Snyder,* 128 S.Ct. at 1208. Thus, "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder,* 128 S.Ct. at 1207.

### C. Analysis of Appellant's *Batson* Challenge

Smith argues that the trial judge clearly erred in rejecting his *Batson* challenge, in that she "failed to rigorously scrutinize the prosecutor's explanations as the third step of the *Batson* inquiry demands," did not consider "the strength of the prima facie case" when ruling that she had no reason to question what the prosecutor said, and failed to consider "the lack of logical connection between the [prosecutor's] assert-

ed explanations and the case to be tried." Further, Smith contends, Judge Retchin "expressed no skepticism of the 'pretextual timing' of new explanations [that the prosecutor] offered only after the initial explanation was discredited," "took no account of the prosecutor's failure to ask voir dire questions about matters supposedly of concern," did not "scrutinize the prosecutor's reliance on body language and demeanor," and "did not consider the absence of record support for the explanations offered." Instead, Smith asserts, the judge "mischaracterized the record and mischaracterized the prosecutor's explanations" and "essentially gave the prosecutor a pass." For the reasons explained below, we do not agree.

1. *The Backdrop for Our Analysis: the Presence and Strength in this Case of Factors Supporting An Inference of Discrimination*

We have no occasion to decide in this case "the preliminary issue of whether the defendant had made a prima facie showing" of racial discrimination. *Hernandez v. New York, supra,* 500 U.S. at 359, 111 S.Ct. 1859. That is because "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination," that preliminary issue "becomes moot." *Id.; see also Epps v. United States,* 683 A.2d 749, 752 (D.C.1996). There can be no doubt, however, that here the *Batson* inquiry was justified by the prosecutor's use of eight of nine of the peremptory strikes to remove African-American jurors, who constituted less than half of the venire that remained after strikes for cause had been made.[14] Never-

---

14. Smith's brief informs the court that there were thirty-five venirepersons who were avail-

able for selection for the petit jury, including

theless, in this case we are not persuaded that the statistics alone made a compelling case of discrimination.[15] As the Supreme Court observed in *Miller-El II*, "[m]ore powerful than the bare statistics are side-by-side comparisons of some black venire panelists who were struck and white ones who were not." 545 U.S. at 232, 125 S.Ct. 2317. Our precedents identify other factors as well—few of which were present here—that make a prima facie case under *Batson* "so compelling," *Tursio*, 634 A.2d at 1213, and that call for "more rigorous scrutiny." *Id.* at 1212; *see also Evans*, supra, 682 A.2d at 650.

The defendant in *Tursio* was a Latino charged with murdering a black man. 634 A.2d at 1206. The government's primary witness was a black man, Guiles, who had witnessed the stabbing, but two other witnesses were white women who "repudiated Guiles's identification testimony." *Id.* The prosecutor had used his peremptory strikes "to eliminate all the whites from the regular jury," thus "creating an all-black jury," 634 A.2d at 1207, 1210. "[S]tatistics, combined with the racially-charged nature of appellant's trial, ma[d]e the prima facie showing of racially discriminatory strikes quite compelling." *Tursio*,

634 A.2d at 1210. We observed that "the government's case turned on whether the jury would find more credible the black witness or the white witnesses." *Id.* at 1210. Heightened scrutiny was essential because "in this racially-charged case[,] the Latino defendant was to be tried, after the prosecutor's peremptory strikes, exclusively before jurors of the victim's race." *Id.* at 1211. We said that in this context, the trial's court's rationale that "I don't have any reason to disbelieve [the prosecutor]" was not enough. *Id.* at 1212. Further, we noted, the prosecutor had struck white jurors for reasons (such as their having been crime victims) that were equally applicable to black jurors who were allowed to remain. *Id.* We concluded that, as defense counsel had urged, the trial court "should have probed the prosecutor in detail about his different treatment of similarly situated jurors." *Id.* at 1209, 1213.

This case, by contrast, is not one that "invites skepticism at the outset." *Byrd v. United States*, 870 A.2d 71, 73 (D.C.2005). First, Smith has not suggested, and we are unable to conclude, that this case was particularly racially charged.[16] Cf. (Leon) *Robinson*, 878 A.2d at 1287 (reasoning

---

sixteen African–Americans, one Latina, and eighteen other non-African-Americans.

**15.** We cannot ignore the fact that defense counsel, too, struck eight regular jurors of one race (eight white jurors). This calls to mind a comment that one of our colleagues made in *Nelson*: "Indeed, if the issue had [timely] been presented to him, the judge could have made a similar determination [about a prima facie case of discrimination] with respect to the defense." *Nelson*, 649 A.2d at 313 (Schwelb, J., concurring). We also observe that the fact that Smith's defense counsel exercised most of his peremptory strikes to remove white venirepersons from the pool diminishes at least somewhat the disproportionality of the prosecutor's strikes against African–American venirepersons. *Cf.* (Edward) *Robinson, supra,* 890 A.2d at 685.

**16.** We do not ignore the reality that, in light of the history of race relations in this country, any trial involving participants of different races involves the potential for conduct motivated by racial bias. As the Eighth Circuit has noted, research indicates that "[j]urors' judgments are affected by the race of the participants in a trial" (leading the researchers to urge that "[w]henever criminal defendants ... are minority group members, attention must be directed to exploring" the racial attitudes of prospective jurors). *United States v. Love*, 219 F.3d 721, 728, 729 (8th Cir.2000) (observing also that in some federal circuits, "courts are *required* to inquire as to possible racial biases of veniremen when the defendant is a racial minority") (citations omitted).

that, in determining whether an inference of discrimination was warranted, that the court could not "ignore certain salient facts about the case" that might support an inference that the prosecutor was motivated to strike prospective jurors on the basis of race and gender). The race of the parties and their counsel is one factor pertinent to whether a case is racially-charged.[17] Here, the jury-selection transcript discloses that Smith's defense counsel was African–American. As far as we have been able to discern, however, the record nowhere discloses (and the parties' briefs make no representations about) the race of Smith himself. Similarly, nothing is said about the race of the prosecutor (although the record does suggest that he was not African–American).[18] Perhaps we may draw inferences about the race of Smith and that of the prosecutor, but the fact that Smith has not argued that the race of either contributed to the strength of his claim of discrimination cautions us against doing so.

Further—unlike in *Tursio*—there is no evidence that the jurors who heard the case had to make a "credibility assessment between witnesses of different races." *Evans*, 682 A.2d at 650 (distinguishing the facts of *Tursio* ). This case therefore does not present one of the primary circumstances that made the prima facie case in *Tursio* compelling and that made insufficient the "inherent logic and credibility of the prosecutor's individual explanations as to each stricken venireperson." *Tursio*, 634 A.2d at 1212, 1213 (recognizing that "[s]trikes based on race are even more likely to occur when the government's entire case turns, as it did here, on whether the jury believes the testimony of the black witness over the two white witnesses").

In addition, there was no identifiable "victim" (and *a fortiori*, no victim of another race), and we have no basis for inferring that the prosecutor was attempting to eliminate jurors who were of a different race from prosecution witnesses. Nothing in the record suggests, and Smith does not argue, that the prosecutor's explanations for striking African–American jurors were equally or even similarly applicable to white jurors who were allowed to remain. *See Nelson v. United States*, 649 A.2d 301, 311 (D.C.1994) ("Here, there was no evidence that the prosecutor had treated similarly situated men and women differently"). There also is no evidence that the prosecutor subjected African–American venire members to more difficult questioning than non-African-American members, or that he pursued certain types of questions only with African–American venirepersons, or that he or his office systematically engaged in racially discriminatory jury selection. *Cf. Miller–El II*, 545 U.S. at 255, 265, 125 S.Ct. 2317. Nor do we discern that there were "apparent inconsistencies between the explanations given and the actual exercise of the peremptory strikes." *Capitol Hill Hosp., supra* note 12, 697 A.2d at 766 (Ruiz, J., concurring).

17. *See* (Edward) *Robinson v. United States*, 890 A.2d 674, 683 (D.C.2006) ("Other relevant circumstances may include the nature of the case and the race or gender of the defendant and other participants in the trial"); *Tursio*, 634 A.2d at 1210 (including, in a list of several factors that made the case racially-charged, statements that "Counsel in this case were also of different races. The prosecutor was black; the defense attorney was white").

18. We have in mind the trial judge's remark about not knowing whether the prosecutor had a "biased bone in [his] body" as he struck African–American jurors, and the umbrage that Smith's defense counsel took "as an African–American" to the prosecutor's questions about the intelligence of certain of the stricken jurors.

Moreover, although the prosecutor eliminated eight African–Americans as regular jurors, four remained on the jury.[19] That fact, too, makes this case different from *Tursio*, where we said that "more rigorous scrutiny by the trial court is essential, especially in light of the prosecutor's elimination of all non-black venirepersons from the jury." *Tursio*, 634 A.2d at 1212; *see also Snyder*, 128 S.Ct. at 1207 (concluding that prosecutor's proffered reasons were a pretext for racial discrimination in case where "all 5 of the prospective black jurors were eliminated by the prosecution through the use of peremptory strikes"). In addition, the prosecutor explained affirmatively that he had given a "thumbs-up" to the four African–American jurors who remained on the petit jury, and explained in particular that he wanted Juror 75, an African–American business owner, on the jury.[20] Of course, the trial court was not required to believe these statements, but nothing on the record before us renders them facially implausible. This is not case in which "[t]he whole of the [record] subject to consideration casts the prosecution's reasons for striking venirepersons in an implausible light." *Miller–El II*, 545 U.S. at 252, 125 S.Ct. 2317.

In sum, while we reiterate that the trial judge was required to "undertake 'a sensitive inquiry into such circumstantial and direct evidence of [the prosecutor's] intent as may be available,'" *Tursio*, 634 A.2d at 1211 (quoting *Batson*, 476 U.S. at 93, 106 S.Ct. 1712), we do not begin with skepticism about whether the trial judge did all that she was required to do procedurally.[21]

19. To be sure, this is not dispositive, in part because the government did not have enough peremptory strikes to eliminate all of the African–American venirepersons, even if the prosecutor had wished to do so. *Cf. Miller–El II*, 545 U.S. at 249–50, 125 S.Ct. 2317 ("With at least three remaining panel members highly undesirable to the State, the prosecutors has to exercise prudent restraint in using strikes. T[heir] late-stage decision to accept a black panel member does not, therefore, neutralize the early-stage decision" to strike the black venireman in question); *see also* (Leon) *Robinson*, 878 A.2d at 1286–87 ("We are unmoved by the government's observation that, on three occasions when there was a black female juror seated in the jury box, the prosecutor struck a juror from the panel instead.... It is fallacious to assume that a prosecutor's temporary willingness to 'risk' a single black female juror negates all the other indications of discriminatory intent"). Still, we take note (and the trial court took note) that the prosecutor used a strike against a Hispanic venireperson even while African–Americans remained as prospective jurors.

20. Thus, this is not a case in which the prosecutor "stat[ed] that he challenged [all African–American jurors as a group] on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." *Batson*, 476 U.S. at 97, 106 S.Ct. 1712.

21. We note that the trial judge repeatedly told the prosecutor that he must "justify for the record each of your strikes." In addition, nothing in the record suggests that the court "misunderstood its obligation to evaluate the prosecutor's explanations." *People v. Johnson*, 47 Cal.3d 1194, 255 Cal.Rptr. 569, 767 P.2d 1047, 1055 (1989).

Smith complains that the court just said "your next strike?" (or something to that effect) after hearing many of the prosecutor's explanations. However, this was not inappropriate, because "the reason offered for each particular strike cannot be viewed in isolation; rather, the plausibility of each explanation may strengthen or weaken the assessment of the prosecution's explanation as to other challenges." *Jones v. State*, 938 A.2d 626, 633 (Del.2007) (citation and internal quotation marks omitted). Indeed the trial court should not "focus exclusively on whether the prosecutor's explanations about each rejected juror were logical and believable" but should "assess [ ] each challenge in the entire context of the case...." *Tursio*, 634 A.2d at 1211–12.

Judge Retchin's initial response, after the prosecutor had provided explanations for his first six strikes, was that she would not make

See Nelson, *supra*, 649 A.2d at 311 ("the prima facie case here is not so compelling as in *Tursio*, a factor which this court took into account in finding inadequate the trial court's inquiry into the prosecutor's explanations for rejection of the jurors in *Tursio*"). Nor do we approach with skepticism the trial judge's statement that she was "not able to discredit" the prosecutor's race-neutral explanations for his strikes.

*2. Whether the Prosecutor's Explanations for His Strikes Had a Logical Connection to the Case and Were Supported by the Record*

■ Smith argues that there was a "lack of logical connection between the [prosecutor's] asserted explanations and the case to be tried." He asks, "Why would a prosecutor seek 'sophisticated' jurors in a drug and gun possession case?" and asserts that "this case was not complex" so as to require jurors of special intelligence. The record shows, however, that—as the parties certainly would have anticipated on the facts of this case—jurors were instructed on the concept of constructive possession, "a more complex concept" than is entailed in cases involving actual possession. *Commonwealth v. Petersen,* 67 Mass.App.Ct. 49, 851 N.E.2d 1102, 1107 (2006). The jury also had to grapple with the similarly difficult concept

of what constitutes possession and control of premises for purposes of the crime of CPWL.[22] We cannot say that the trial judge clearly erred by accepting the prosecutor's explanation that some of his strikes were motivated by a concern about jurors' intelligence.

We also cannot conclude that there was a lack of record support for the prosecutor's concern about certain jurors' intelligence. As Smith argues, the transcript shows that the jurors in question (Jurors 478 and 895 and, perhaps, Juror 524, the recent high-school graduate whom the prosecutor said he could not understand) responded logically to questions, recounted employment history, and gave information about their lives that seems consistent with rational decision-making. But, for example, Juror 895 admitted to a history of seizures and told the court that he works "in the Navy Yard for Melwood." Melwood is "a nonprofit corporation that employs developmentally disabled and mentally challenged individuals." *FCE Benefit Adm'rs, Inc. v. George Wash. Univ.,* 209 F.Supp.2d 232, 235 (D.D.C. 2002). This description is not part of the record, but Judge Retchin's inquiries of Juror 895 ("And Melwood is in suburban Maryland?" "I didn't know they had an office in the District")[23] indicate that she was familiar with the organization.[24] On

---

a *Batson* finding at that time since "she was not able to determine whether you [the prosecutor] perceived that [venirepersons] made better eye contact with [defense counsel] or had a relationship to [him] superior to yours." Her ultimate ruling was to accept the prosecutor's explanation about certain jurors "[engaging] with [defense counsel]" in light of "how voir was conducted" in the case. We read this as a reflection of Judge Retchin's more considered judgment as she continued to watch the dynamics of the voir dire and heard counsel's remarks. Accordingly, we are satisfied that this is not a case where "the record does not show that the trial judge actually made a determination concerning"

the reasons that the prosecutor proffered. *Snyder,* 128 S.Ct. at 1209.

**22.** In a note sent to the judge during deliberations, the jury asked, "For purposes of element five of count one (carrying a pistol without a license), what exactly constitutes possession and control of premises?"

**23.** Defense counsel also confirmed with Juror 895, "You said Melwood?"

**24.** We consider this because we are to evaluate the government's proffered reasons for striking jurors in light of the entire record on appeal. *See Snyder,* 128 S.Ct. at 1210.

that basis, she could conclude that a reasonable person could infer or suspect that Juror 895 was mentally challenged and that the prosecutor's explanation regarding Juror 895 was not pretextual. *See Hernandez v. New York,* 500 U.S. at 369–70, 111 S.Ct. 1859; *see also Snyder,* 128 S.Ct. at 1211 (evaluating the prosecutor's explanations by taking into account generally-known information not in the record).

As to Jurors 478 and 524 (the unemployed former custodian and the unemployed former Auto Zone employee who had recently graduated from high school), the cold transcript cannot tell us whether they sounded "intelligent," but Judge Retchin heard them speak and had the opportunity to observe their demeanor. She told the prosecutor that she would seat any juror as to whom the prosecutor's explanation was not credible, so we have reason to assume that her own impression of the jurors did not cause her to deem the prosecutor's explanation implausible. *Cf. Smulls v. Roper, supra,* 535 at 861 ("by denying the *Batson* challenge, the trial court implicitly found that the prosecution's proffered nondiscriminatory reasons were credible. No further fact-finding was required"); *Messiah v. Duncan,* 435 F.3d 186, 198 (2d Cir.2006) ("As long as a trial judge affords the parties a reasonable opportunity to make their respective records, he may express his *Batson* ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of a *Batson* challenge").

Moreover, Judge Retchin explicitly countered the prosecutor's statements that a juror was "hostile" or "scary" with her own contrary impressions, and she pushed the prosecutor to explain his use of the word "scary." The contrast between those reactions and Judge Retchin's reactions to the prosecutor's comments about certain jurors' intelligence is telling. Judge Retchin did not take issue with the prosecutor's rationale about some jurors' perceived intelligence, and, in explaining her finding that the prosecutor "was not using the word 'intelligence' as a code word for race," she said that she understood that the prosecutor "was explaining that that particular juror was not sophisticated or educated in the way he would hope a juror might be." The contrast suggests strongly that Judge Retchin either concurred with the prosecutor's impression, or had no difficulty adjudging it as honest and plausible.[25] While Judge Retchin might have done better explicitly to "assess the plausibility of [the prosecutor's proffered] reason," *Miller–El II,* 545 U.S. at 252, 125 S.Ct. 2317, we cannot conclude conscientiously that she failed to make the evaluation that was required. *Cf. Lamon v. Boatwright,* 467 F.3d 1097, 1101 (7th Cir. 2006) ("Although it is certainly good practice to explain why a proffered explanation has been found credible, we cannot conclude that the Wisconsin Supreme Court unreasonably applied clearly established Supreme Court precedent in declining to require anything … of the trial judge in this case" beyond its "terse ruling"); *see also Isaac v. Brown,* 205 Fed.Appx. 873, 876 (2d Cir.2006) ("We do not require a talismanic recitation of specific words in order to satisfy *Batson's* requirement that the trial court must rule on the credibility of the race-neutral reason for the peremptory challenge") (citation and internal quotation marks omitted); *Smulls, supra,* 535

---

**25.** We note, too, that defense counsel never directly took issue with the prosecutor's statements about Jurors 478, 524 and 595. He called the prosecutor's comments about jurors' intelligence "improper and unprofessional," and said that "Counsel himself is offended by that characterization," but never asserted to the court that the jurors seemed intelligent.

F.3d at 861 ("federal law has never required explicit fact-findings following a *Batson* challenge").[26]

■ Referring to Juror 372, the DEA paralegal, Smith asks "Why was a DEA employee, even an 'abrupt one,' not preferable to a juror with no obvious commitment to the war on drugs?" We think that Smith probably overstates this juror's zeal for the war on drugs; she told the court that she could be fair to both sides "[b]ecause I feel that if there's not enough ... for probable cause within the drug-related part of it, then it's not fair" (and the court had to instruct her, "Well, the jury doesn't determine probable cause"). In any event, especially in light of Judge Retchin's repeated observation that this juror was "abrupt to the prosecutor" we cannot agree that there is no support in the record for the prosecutor's explanation that he perceived the juror as hostile.

■ As we earlier described, the prosecutor's proffered reason for striking Juror 542 was that he felt that this juror had already established a rapport with defense counsel during defense counsel's "extensive questionings" of her. We agree with Smith that explanations based on "rapport" should be treated like explanations based on body language and demeanor— *i.e.,* they "must be closely scrutinized because they are subjective and can easily be used by a prosecutor as a pretext for excluding persons on the basis of race." *Tursio,* 634 A.2d at 1213 n. 7 (citation omitted).[27] But we are satisfied that Judge Retchin did that here, testing the prosecutor's explanations about rapport (between Juror 542 and defense counsel) and his similar explanations about eye contact (between Juror 774 and defense counsel) with her own observations about "how the voir dire was conducted here."[28] Judge Retchin's observations provided a basis in the record to accept the prosecutor's explanations about rapport. *See Davis v. Fisk Electric Co.,* 268 S.W.3d 508, 518 (Tex.2008) (verification of an occurrence that is the proffered basis for a strike "may come from the bench if the

---

**26.** In arriving at this conclusion, the Eighth Circuit in *Smulls* acknowledged that, in *Snyder,* "the [Supreme] Court refused to presume that the trial court credited the prosecutor's explanation that he struck the challenged juror based on the juror's demeanor because the trial court made no determination regarding the juror's demeanor." *Smulls,* 535 F.3d at 865. But, the *Smulls* court explained, this refusal followed from the fact that, *inter alia,* the *Snyder* prosecutor offered two reasons for his strike, one of which was clearly pretextual.... "[The Supreme Court] was unwilling to assume the trial court relied on the first reason when the Court found that the second reason did not stand up to scrutiny ..." *Smulls,* 535 F.3d at 865. Here, because the prosecutor offered only one reason that was not "clearly pretextual" to justify the strike, *Snyder* does not preclude us from assuming that Judge Retchin credited that reason in rejecting the *Batson* challenge, even though she did not explicitly say so.

**27.** At the same time, concern about a juror's rapport with opposing counsel can be a legiti-

mate, race-neutral basis for a peremptory strike. *See Majid v. Portuondo,* 428 F.3d 112, 117, 131 (2d Cir.2005) (upholding rejection of *Batson* challenge and describing as "plausible" the prosecutor's explanation that he struck jurors on the basis of their "apparent inability to establish a rapport with prosecutors or a contrasting ability to do so with defense attorneys," factors that the appellate court agreed "could have raised prosecution concerns about the degree of sympathy that the prospective jurors might feel for the defendants, the skepticism with which they might view the prosecution's case, and any other hesitation they might harbor about rendering a verdict adverse to the defendants").

**28.** The court was entitled to rely on her own observations about counsel's demeanor in assessing the prosecutor's proffered reasons for his strikes. *See Snyder,* 128 S.Ct at 1208 ("The trial court's first-hand observations" of demeanor are of "great[ ] importance").

court observed it" or "may be otherwise borne out by the record"). Judge Retchin observed that defense counsel had frequently "turn[ed] his back to the Court" while "engaging in one-on-one with the juror." That statement suggests that Judge Retchin may have had no opportunity to observe specifically whether there was the eye contact that the prosecutor had described. But Judge Retchin also remarked that "the dynamics of voir dire was [sic] something of note in this case." She witnessed the "energy" of the attorneys' "language and body positioning," likening it to a "horse and pony show." She observed that counsel were attempting to "outdo each other, so to speak, to develop a rapport with jurors."[29] Earlier, she had told defense counsel that "you in particular, were having engaged conversations with people. And the prosecutor may legitimately find that you were using that to develop a rapport with ... Juror [542]."

Judge Retchin concluded that she could not discredit the prosecutor's explanation that "certain jurors engaged more with" defense counsel. Thus, the court did not simply "give the prosecutor a pass," as Smith asserts. Rather, she looked to the "circumstantial and direct evidence of intent as may be available," *Batson,* 476 U.S. at 93, 106 S.Ct. 1712 (citation omitted); assessed the plausibility of the prosecutor's explanations "in light of all evidence with a bearing" on them, *Miller–El II,* 545 U.S. at 252, 125 S.Ct. 2317; and considered "all relevant circumstances." *John-*

*son,* 545 U.S. at 170, 125 S.Ct. 2410. And because "determinations of ... demeanor lie peculiarly within a trial judge's province, ... in the absence of exceptional circumstances," we must defer to the trial court's determinations as to these matters. *Snyder,* 128 S.Ct. at 1208 (citations and internal quotation marks omitted).

Smith also asserts that there is an absence of record support for the prosecutor's explanations about defense counsel's many questions to venirepersons (and he argues that the trial court, too, mischaracterized the record). For example, he points to transcript pages showing that he asked only one question of Juror 542, the flight attendant, not "extensive questionings," as the prosecutor asserted. However, this argument overlooks the trial court's repeated statements to the effect that defense counsel and the prosecutor "often spoke simultaneously," leaving the "court reporter [to] just capture who was the more persistent in taking down what was being said" and the court's recollection about the many times when she had to ask defense counsel "to please talk into the microphone because he was engaging in one-on-one with the juror, turning his back to the Court." Thus, even though the transcript does not otherwise bear out the prosecutor's explanations about defense counsel's extensive questioning of venirepersons, in light of Judge Retchin's own observations, we cannot say that the court clearly erred in accepting the prosecutor's explanations.[30]

---

**29.** Smith is correct that "a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Miller–El II,* 545 U.S. at 252, 125 S.Ct. 2317. However, we reject Smith's argument that the trial court supplied reasons other than those which the prosecutor proffered. We recognize that Judge Retchin referred to the two counsel "try[ing] to outtalk each other during voir dire" before the prose-

cutor mentioned defense counsel's "extensive questionings." But the prosecutor initiated comments about defense counsel's eye contact and rapport with prospective jurors, and the prosecutor specifically mentioned defense counsel's "talk[ing] to [a juror] for quite some time" and "start[ing] off ... questions" to "a lot of the [venirepersons]."

**30.** We also note that defense counsel's own explanation to the court, after asserting that

### 3. Whether the Trial Court Accepted Explanations Whose Timing Was Pretextual

We are given greatest pause by the prosecutor's explanations for striking Juror 774, whom the prosecutor said he found "kind of scary." As to this juror, defense counsel reacted promptly, saying that in his opinion the juror seemed "very gentle and very humble." Judge Retchin obviously was troubled by the prosecutor's explanation, as she pressed him about it, saying that she "wanted to be sure his race was not a factor in your finding him scary." Smith focuses in particular on this juror, arguing that the trial court's resolution as to this juror was inadequate because the court "expressed no skepticism of the 'pretextual timing' of new explanations [that the prosecutor] offered only after the initial explanation was discredited" and "took no account of the prosecutor's failure to ask voir dire questions about matters supposedly of concern." Smith relies in particular on the Supreme Court's admonition that a prosecutor's explanations that "reek [ ] of afterthought" and a prosecutor's "failure to engage in any meaningful voir dire examination on a subject the government alleges it is concerned about" are "evidence suggesting that the explanation is a sham and a pretext for discrimination." *Miller–El II,* 545 U.S. at 246, 125 S.Ct. 2317.

We think it is not entirely correct to say that Judge Retchin discredited the prosecutor's statement that Juror 774 seemed "kind of scary." Certainly, the court did not accept that the juror was "scary" as the term is used in common parlance. But

the prosecutor explained that he was using the term "scary" only as "shorthand," having "very little time to write things down." However, as to what Smith refers to as the "pretextual timing" of "new explanations" that the prosecutor offered when he was pressed on the point, the record does show that the explanations that the prosecutor gave when the court revisited the issue were different from those he first gave. The prosecutor began by explaining that Juror 774, "a teacher doing social studies," "gave [defense counsel] good eye contact" and "didn't ... respond [ ] very well to me." After Judge Retchin stated that she "did not perceive that,"[31] the prosecutor continued his explanation about the juror's good eye contact with defense counsel and then commented that, as a teacher of social studies, Juror 774 might "be more interested in doing things that are more to the left of center." It was only when Judge Retchin revisited the issue of Juror 774 later in the proceedings that the prosecutor mentioned, for the first time, that Juror 774 smiled at inappropriate times.

We do not find it implausible that the prosecutor would be wary of a juror who said that his "specialty is social studies." *But see Whitsey v. State,* 796 S.W.2d 707, 716 (Tex.Crim.App.1989) (holding that prosecutor's strike of black juror because she was a teacher and teachers were "liberal," when nothing in the record bore out that characterization, was insufficient as a matter of law). Nevertheless, we agree that, on the record before us, the court would have erred in accepting the prosecutor's explanation on this point, because the prosecutor asked Juror 774 no voir dire

he asked Juror 542 only one question, was that he may have asked a few other questions about community activities and the like. This, too, suggests that he may have asked questions not reflected in the transcript.

31. The transcript does not make clear whether Judge Retchin meant that she did not perceive that the juror was "scary" or, instead, did not perceive that the juror made good eye contact with defense counsel and did not respond well to the prosecutor.

questions on this purported area of concern.[32] And, at least arguably, the prosecutor's explanation based on Juror 774's status as a social studies teacher was an afterthought: the prosecutor mentioned that status in the first sentence of his explanation, and went on to offer his "left of center" explanation in his first wave of explanations (i.e., before the court revisited the issue of Juror 774), but he did so only after Judge Retchin had said that she did not share the prosecutor's perception about the juror. We also agree that the prosecutor's explanation about Juror 774 smiling at inappropriate times can fairly be treated as an "afterthought."

We will not disturb the trial court's Batson ruling as to Juror 774, however, because the court did not rely on these arguably questionable explanations in making her determination. The court's Batson determination focused on the prosecutor's explanation that he struck certain jurors, including Juror 774, on the basis of their having "engaged with" defense counsel. This was the prosecutor's lead-off explanation about Juror 774, i.e., that he responded to defense counsel with good eye contact,[33] but did not respond well to the prosecutor. It was an explanation that, appropriately, Judge Retchin considered and found plausible in light of her own observations about defense counsel's apparently off-the-record conversations with jurors and about both counsel's efforts to

develop rapport with jurors. On this record, we defer to Judge Retchin's statement that she was "not able to discredit" the prosecutor's race-neutral explanations.

### 4. Whether Appellant Rebutted the Prosecutor's Race–Neutral Explanations

In considering whether the trial judge clearly erred in accepting the prosecutor's explanations, we take particular note of the extent to which defense counsel rebutted the prosecutor's claims. As we observed in note 25 supra, defense counsel did not vouch for or defend the intelligence of the jurors (478 and 895) whom the prosecutor suggested were not particularly intelligent, and did not specifically respond to the prosecutor's comment that he did not understand much of what Juror 524 was saying. Defense counsel readily acknowledged that Juror 013 (jokingly) offered to sell the judge a car.[34] He did not dispute that Jurors 542 and 774 gave him good eye contact, but simply argued that "[t]he eye contact does not bring about a basis to strike someone." And while he vigorously disputed the legitimacy of the prosecutor's concern about Juror 774 having "smiled" at inappropriate times, defense counsel did not suggest that he saw no smiles. Rather, he told the court that "what is gleaned from a smile is simply

---

**32.** Cf. Capitol Hill Hosp., 697 A.2d at 774 (Schwelb, J., concurring) ("Where ... a step-by-step racial purge of the jury-box was effected, judges should take explanations like 'Greenpeace liberal' with more than a single grain of salt").

**33.** Cf. United States v. Rodriguez, 178 Fed. Appx. 152, 156 (3d Cir.2006) (reasoning that prosecutor's explanations about his perception of jurors' lack of eye contact were a sufficient explanation at step two of Batson); United States v. Cordova, 186 Fed.Appx. 742, 744 (9th Cir.2006) (holding that trial court

did not commit plain error by permitting prosecutor's strike for proffered reason of juror's "negative body language and eye contact").

**34.** The trial judge's decision as to Juror 013 was not clear error. See, e.g., (Michael Bernard) Jones v. State, 226 Ga.App. 428, 487 S.E.2d 62, 64–65 (1997) (upholding trial judge's decision to credit prosecutor's claim that he struck a particular juror because the juror had responded to questions in a joking manner).

that the man is humble."[35]

■ However, Smith retained the burden of proof. *See Rice, supra,* 546 U.S. at 338, 126 S.Ct. 969.[36] To rebut meaningfully the prosecution's race-neutral reasons for striking jurors, defense counsel needed to "(1) point out that the prosecutor's claims about the particular juror are false," (2) to "point out that although the prosecutor's claims about an excluded juror are true, similar claims can be made about non-excluded jurors who are not minorities, which should raise the suspicion of bad faith," or (3) to "argue that claims about the juror, although true, are so irrational as a reason for striking a juror that they might be pretexts for some undisclosed discriminatory reason." (Leon) *Robinson,* 878 A.2d at 1290 (quoting *United States v. Alcantar,* 897 F.2d 436, 438 (9th Cir.1990)). As our discussion has shown, defense counsel was successful at little of the foregoing. We conclude that the trial court did not clearly err in rejecting the *Batson* challenge, because Smith could not meet his burden by offering only "conclusory assertions" that the prosecutor's reasons appeared to be disingenuous. *Nelson,* 649 A.2d at 311; *cf. United States v. Rodriguez, supra* note 33, 178 Fed.Appx. at 156 (holding that defendant did not meet his burden of proof on his *Batson* challenge because "[w]hen asked to do so by the District Court, the government offered race-neutral reasons for its strikes, which reasons [defendant] never challenged").

5. *Whether the Trial Court Erred in Failing to Require Explanations As to Two Stricken Jurors*

There is one remaining issue that we must address with regard to the *Batson* challenge. Smith decries the trial court's having overruled his challenge without requiring the prosecutor to rebut the inference of racial discrimination as to Jurors 838 and 034, both African–Americans. The prosecutor exercised his eighth strike against Juror 838, just after striking Juror 013 (the BMW salesman), and before defense counsel renewed his *Batson* challenge. In the interest of efficiency and conservation of judicial resources, it certainly would have been a better course for the trial judge to have asked for a proffer as to Juror 838. *See* (Edward) *Robinson,* 890 A.2d at 679 n. 5. However, defense counsel made no mention of this particular strike in renewing his challenge. And defense counsel did not renew his *Batson* challenge when Juror 034 was stricken as an alternate. Instead, when jury selection was completed and the court invited both counsel to "add anything else to the record" in regard to the *Batson* challenge,

35. Defense counsel did dispute the prosecutor's comment that Juror 372 seemed hostile, but was met with the court's repeated observation that the juror *had* been "abrupt to the prosecutor." Defense counsel also asserted that he had asked only one question, rather than—as the prosecutor had described—"extensive" questions, of Juror 542, but the court disagreed (saying, "I don't think it was a single question, Mr. Williamson").

36. *See also* (Leon) *Robinson,* 878 A.2d at 1282 ("if the prosecutor tenders [race-neutral] reasons, the trial court must decide whether the defendant has proved purposeful racial or gender discrimination"); *Nelson,* 649 A.2d at 311 ("once the party has set forth neutral reasons for exercising peremptory challenges in response to a claim of purposeful discrimination, the burden shifts back to movant to show that the proffered neutral reasons are pretextual"); *Smulls,* 535 F.3d at 859 ("The burden then shifts back to the defendant at the third step to shoulder his ultimate burden of establishing purposeful discrimination"); (Michael) *Jones v. State,* 938 A.2d 626, 632 (Del.2007) ("after the prosecutor offers a race-neutral explanation, the burden shifts back to the defendant to prove purposeful discrimination").

defense counsel ended his remarks by saying "That would be our record at this point on the Batson challenge" again without mentioning either Juror 838 or Juror 034.

The striking of Jurors 838 and 034 continued the statistical pattern that had prompted the court's *Batson* inquiry. But (1) with the court having found, notwithstanding the statistical pattern, "no reason to question" the prosecutor's proffered reasons for his other strikes "in light of how the voir dire was conducted here"; and (2) with defense counsel having proffered no argument that the strikes of Jurors 838 and 034 were particularly suspect or that these strikes rendered the prosecutor's other actions suspect, we cannot say that the court clearly erred in finding that the prosecutor's explanations were not pretextual.[37] On this record, we are not left with a "definite and firm conviction that a mistake has been committed." [38]

## II. The Confrontation Clause Issues

We turn next to Smith's argument that the admission of the DEA–7 report in violation of his rights under the Sixth Amendment Confrontation Clause entitles him to reversal of his drug and gun convictions. We begin by describing the evidence that the government presented at trial.

### A. The Evidence at Trial

■ Metropolitan Police Department Officer Bryan Jones testified that on the night of Saturday, April 9, 2005, he was responding to a "disorderly drug complaint" at the Aspen Court Apartments, an "area known to have a lot of narcotics activity," when he encountered appellant Smith nearby, in the 6600 block of Georgia Avenue, N.W. Upon seeing Officer Jones's marked patrol car, Smith began "walking fast away," and he broke into a run when the officer exited his car. Fearing for his safety because of heavy narcotics traffic in the area, Officer Jones drew his service weapon as he pursued Smith through an alley. The officer then saw Smith bend over near a bush that was alongside the east wall of 6666 Georgia Avenue, but he could not see what Smith was doing with his hands. Officer Jones ordered Smith to stop, but Smith continued briskly away. About fifteen feet from where he had bent over, Smith stopped, and Officer Jones placed him in handcuffs.

Officer Jones called for backup, and Officers Jose Garcia and Daniel Hall arrived shortly thereafter. At Officer Jones's request, Officers Garcia and Hall searched the bush where Smith had bent over and the mulch surrounding the bush. Officer Hall announced that he had found a gun partially buried in the ground. While Officers Garcia and Jones were discussing what kind of weapon it was, Smith volunteered that it was a .41 caliber Magnum revolver. Officer Jones responded that Smith "was lying; there is no such thing as a .41 caliber." [39] At this point, Officer

---

37. As Supreme Court jurisprudence makes clear, the fact that the government offered no race-neutral explanation as to those two jurors does not mean that Smith was entitled to prevail on his *Batson* challenge. *Cf. Johnson,* 545 U.S. at 170, 125 S.Ct. 2410 (a finding that defendant established a prima facie case of discrimination at *Batson* stage one means that an inference of discrimination is *permissible,* but does not mean that a finding of discrimination is required if no race-neutral explanation is demanded from the government).

38. *Hernandez v. New York,* 500 U.S. at 370, 111 S.Ct. 1859 (making this comment in the context of observing that the prosecutor had a "verifiable and legitimate explanation for two" of three challenges to jurors that could be identified with confidence as Latinos) (citation omitted).

39. Officer Jones had never heard of this type of firearm, but he later confirmed that Smith's description was correct.

Hall read Smith his rights. Officer Jones testified that, immediately thereafter, Smith said "this is for personal use, not possession." As shown a few lines later in the trial transcript, Officer Jones subsequently testified that Smith's statement was "this [is] for personal use, not distribution."

Officer Jones admitted that he made "mistakes" when he "papered" Smith's case two days after the arrest. He testified that:

The mistake ... was that in the *Gerstein* [statement] [40], ... I said that the dispatcher had asked me the caliber of the weapon and that the Defendant had corrected me by saying a .41 caliber, which in turn, did not happen. What [actually] happened is that I was talking to another officer, Officer Hall, and we were talking about what kind of weapon it was. And that's when the Defendant stated what kind of weapon it was.

On cross-examination, Officer Jones also acknowledged that he had not made any notes about Smith's statements and that, during his (Officer Jones's) first witness conference with the prosecutor, he did not tell the prosecutor about the statements.

Looking at a photograph that was admitted as Government Exhibit 5, Officer Jones testified that it depicted items found by the east wall of 6666 Georgia Avenue, specifically "the weapon handle," "a piece of the torn-off plastic that the narcotics were obtained in," [41] and "half of [a] cell phone." The officer testified that he recovered the back half of the telephone and a digital scale from appellant's pockets.

On cross-examination, however, he acknowledged that the PD–81 property report indicated only that the recovered items were found by the east wall of 6666 Georgia Avenue, and made no reference to the scale and a portion of the cell phone being found on appellant's person. Officer Jones further testified that the recovered items were placed in a heat-sealed evidence bag, and he explained to the jury that the bag was marked with "DEA lab numbers." He explained that "DEA is Drug Enforcement Agency. That's where we send our narcotics to be tested." The bag and its contents were depicted in a photograph admitted into evidence as Government Exhibit 20.

Officer Hall was the government's next witness. He testified that after Officer Jones asked him to "check out" the area where appellant had been standing, he (Officer Hall) told Officer Garcia, a new officer, "not to dig anything, just look for where the [new mulch] may have been disturbed." Thereafter, Officer Hall found part of a cell phone behind a bush, and Officer Garcia said that he saw a gun behind the bush. When Officer Hall stated that he had a cell phone, Officer Jones said, "The other part of the cell phone is here on the ground with the Defendant." Officer Hall testified that while Officers Jones and Hall were discussing what kind of gun it was whose handle was sticking out of the mulch under the bush, "Defendant, on the ground, blurted out, 'It's a 41 Magnum.'" Officer Hall testified that Officer Jones then stated, "There's no such thing as a 41 Magnum; you mean a 44." After reading Smith his rights, Officer

**40.** *See Gerstein v. Pugh,* 420 U.S. 103, 124 n. 25, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

**41.** Although Officer Jones referred to the plastic bag as containing "narcotics," the government did not provide evidence about the appearance or substance of the bag's contents until later on during the government's case-in-chief, when Detective Anthony Washington gave expert testimony. During his closing argument, the prosecutor characterized government exhibits as depicting the "top of the plastic bag."

Hall heard Smith tell Officer Jones, "That's for personal use only."

The government offered and the court admitted into evidence a laboratory report from the Drug Enforcement Administration attesting to its analysis of the contents of the plastic bag. Defense counsel objected to the admission of the so-called DEA–7 report on the basis of *Crawford*,[42] but the trial court overruled the objection.

The next government witness was Officer Israel Ruiz, who testified that he was with the "forensic science division, crime scene search unit" and was responsible for "collecting evidence" at the scene. Officer Ruiz described photographs that he took of the items recovered on the night in question. He testified that he had seen "more than a thousand guns" during his seventeen-year career, but had never seen a .41 caliber handgun before that night.

Finally, Detective Anthony Washington testified as an expert on the packaging and pricing of narcotics for street-level distribution. He testified, on the basis of the DEA–7 report, that the plastic bag recovered from 6666 Georgia Avenue contained 4.5 grams of 84% pure crack cocaine. In Detective Washington's opinion, the cocaine was of high quality and had a street value of $650 to $700.

The defense offered no evidence.

### B. Analysis

We held in *Thomas v. United States*, 914 A.2d 1 (D.C.2006), that a DEA–7 report constitutes "testimonial" evidence, and that under *Crawford*,[43] the government may use it against a criminal defendant only if the defendant either (1) has the opportunity to cross examine the chemist who authored the report, or (2) has waived his Confrontation Clause right as to the chemist. *Thomas*, 914 A.2d at 15, 19. The parties here do not dispute that Smith had no opportunity to cross-examine the author of the DEA–7 report and never waived his rights under the Confrontation Clause. On the basis of *Smith*, the parties agree that the DEA–7 report was improperly admitted against Smith. They also agree that the defense objected to the admission of the DEA–7 "under *Crawford*," and therefore that Smith need not meet the rigorous "plain error" test to be entitled to reversal of his drug possession conviction on Confrontation Clause grounds. The parties further agree that admission of the DEA–7 was not harmless error with respect to the charge of unlawful possession of a controlled substance. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt").

But there the agreement ends. The government contends that admission of the DEA–7 report was harmless error with respect to appellant's *attempt* to possess a controlled substance. It urges us to reverse Smith's conviction for possession and to remand for entry of a judgment of conviction for the lesser-included offense of attempted possession. The government also argues that admission of the DEA–7 was harmless error with respect to appellant's CPWL, UF and UA convictions, and that these should be affirmed. Smith argues that he is entitled to a new trial on all charges. He contends that the erroneous admission of the DEA–7 report was not harmless error even as to attempted possession, and similarly was not harmless as to the convictions on the gun charges be-

---

**42.** *See Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

**43.** *See note 42, supra.*

cause "there is a reasonable possibility that [admission of the DEA–7 report] might have contributed to the conviction[s]." *Chapman, supra,* 386 U.S. at 23, 87 S.Ct. 824 (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)). We address these arguments in turn.

### 1. *The Cocaine–Possession Conviction*

▮ Attempted unlawful possession of a controlled substance is a lesser-included offense of simple possession. *Fields v. United States,* 952 A.2d 859, 860 (D.C. 2008).[44] To obtain a conviction for attempted possession, the government must prove that the defendant intended to possess an unlawful substance, but it need not prove (as it must in order to obtain a conviction for possession) that the substance involved was actually unlawful. *See id.* at 864–65 (citing *Seeney v. United States,* 563 A.2d 1081, 1083 (D.C.1989)) (in an attempted possession prosecution, the government need not establish that "the substance a defendant attempted to possess was the proscribed substance," but it must prove that the defendant had "the requisite criminal intent").

This court "may direct the entry of judgment for a lesser-included offense when a conviction for a greater offense is reversed on grounds that affect only the greater offense." *Willis v. United States,* 692 A.2d 1380, 1383 (D.C.1997) (quoting

*Rutledge v. United States,* 517 U.S. 292, 306, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996)); *see also Bowler v. United States,* 480 A.2d 678, 687 (D.C.1984) (reversing murder conviction and remanding for either retrial or entry of judgment for lesser-included offense of manslaughter). But we will do so only if we are satisfied beyond a reasonable doubt that the trial court error that requires reversal with respect to the greater offense was harmless with respect to the lesser-included offense. *See Fields,* 952 A.2d at 864.

As we recognized in *Fields,* the Supreme Court has "formulated in different ways" the test for analyzing whether constitutional error was harmless. *Id.* at 862. The relevant inquiry is whether the government can show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," *Chapman,* 386 U.S. at 24, 87 S.Ct. 824; whether at trial the government presented "overwhelming evidence" of guilt, *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); "whether the guilty verdict actually rendered ... was surely unattributable to the error," *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)[45]; or whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder, supra* note 45, 527 U.S. at 18, 119 S.Ct. 1827.[46] Asking those ques-

44. *See also Dorsey v. United States,* 902 A.2d 107, 111 n. 3 (D.C.2006) ("Every completed criminal offense necessarily includes an attempt to commit that offense, ... and a person charged with an attempt to commit a crime may be convicted even though the evidence shows ... a completed offense ..., not merely an attempt") (citations and internal quotations and brackets omitted).

45. In a subsequent case, the Supreme Court suggested that *Sullivan's* formulation of the *Chapman* standard applies only where the

error complained of is the trial judge's failure to give a "reasonable doubt" instruction to the jury. *See Neder v. United States,* 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

46. *See also McCoy v. United States,* 890 A.2d 204, 208 (D.C.2006) ("this court has alternatively phrased the rule thusly: if, after excluding the contents of the illegally obtained confession from the record, there remains overwhelming evidence to support the jury's verdict, then admission of the confession into

■■■■■■■■■■■■■■■■

tions in *Fields,* we concluded that "the erroneous admission of the DEA–7 report without an opportunity to cross-examine the chemist who prepared it was not harmless beyond a reasonable doubt as to the offense of attempted possession of marijuana." *Fields,* 952 A.2d at 869.

■■ Because the facts of this case are similar to those of *Fields,* we describe our analysis there in some detail. At the scene of Fields's arrest, police had searched him thoroughly and found no drugs on him. At the police station, however, as one Officer Bolden was removing loose property from him, a green weed-like substance fell from the crotch area of his pants. The officer also saw "a clear plastic bag with a green weed substance underneath the bench" in the holding cell where "[Fields] had been placed," and Fields "was the only person in the cell at the time." *Id.* at 861. At trial the officer started to describe a field test of the green weed substance, but the judge cut him off, saying "we can dispense with this part of the testimony since we have the DEA–7." *Id.*

In undertaking our analysis of whether the error in admitting the DEA–7 report was harmless, we acknowledged that the evidence made it "more likely than not" that Fields intended to carry contraband, reasoning that "[h]iding a green weed substance in a private area of the body is not commonplace and surely permits an inference that it might be … contraband." *Id.* at 867. We concluded, however, that the government "did not … present over-

whelming evidence that appellant intended to possess marijuana," observing in particular that the evidence was not "overwhelming" that the contraband had come from Fields. *Id.* at 868, 869. We noted that defense counsel had cast doubt on the credibility of Officer Bolden, who was "the only witness to have seen the green weed substance fall from appellant's pants." *Id.* at 867. His testimony "could have been subject to question" in light of another officer's testimony that no contraband was found on Fields when he was "searched thoroughly from head to toe" at the time of his arrest and the lack of evidence that the holding cell was clean when Fields entered it. *Id.* We recognized that "the jury could well have had a doubt about the government's case if the prosecution did not proffer the type of scientific evidence establishing the identity of the substance that is commonly expected." [47] 952 A.2d at 867. We reasoned that, on the facts of the case, the government would have had "to prove that the substance was marijuana in order to prove appellant's attempted possession," and that "in view of the conclusive finding of the DEA–7 report that the substance was marijuana, it [was] impossible to say that admission of the report did not contribute to the jury's verdict." *Id.* at 866. (citations and internal quotation marks omitted).

In the instant case, as in *Fields,* the evidence other than the DEA–7 report that Smith intended to possess an unlawful substance—even if it was more than

evidence will not warrant a new trial") (citations and internal quotation marks omitted).

47. We distinguished Fields's case from one "where the government sought to prove attempted possession of an illegal substance with circumstantial evidence of the defendant's intent" such as "a transaction during which the defendant had manifested his intent to buy or sell a particular drug," *id.* at 865–

66. *Cf. Thompson v. United States,* 678 A.2d 24, 27–28 (D.C.1996) (evidence that defendant had a bundle of packets, handed one of the packets to someone, and got into a fight with that person when he complained that it was "not real," and later counted the packets "plainly manifested her intent to distribute a controlled substance.").

"scant"—certainly was not overwhelming. *Id.* at 865. In responding to the scene, Officer Jones had no description of anyone matching Smith's description[48] and the officer never saw anything in appellant's hands.[49] Aside from the DEA–7 report, the evidence bearing on attempted possession included (1) the testimony that the plastic bag depicted in the government's photographic exhibits was found near the bush where Smith had bent over while Officer Jones was pursuing him; (2) Government Exhibit 20, a photograph of the evidence bag containing the plastic bag (of what presumably was a rock-like substance) that was sent to the DEA for analysis; and (3) Smith's statement, recounted by both Officer Jones and Officer Hall, that "that's for personal use." As we explain, all of this evidence "could have been subject to question." *Id.* at 867.

Officer Jones was the only witness who claimed to have seen Smith bend over near the bush, and defense counsel called the officer's credibility into question by pointing out inconsistencies between his trial testimony and what he stated in police reports completed after the arrest. Furthermore, while the handle of the gun found in the mulch was immediately visible to the officers, most of the plastic bag and its contents were not. Officer Jones testified that the photograph of the mulched area showed only the top piece of the plastic bag, and, during his testimony, Officer Hall said nothing whatsoever about having seen a plastic bag. We think the jury could certainly have harbored doubt about whether the more-deeply-buried plastic bag and its contents belonged to Smith, and hence about whether Smith intended to possess the plastic bag, even if the jury believed that he bent over the bush and placed the gun in the mulch.[50] For these reasons, we cannot say that the evidence discussed so far was so overwhelming that the jury was compelled to believe that there was a connection between appellant and the plastic bag containing the rock-like substance.

Any doubt that jurors had about Smith's intent to possess the contents of the plastic bag might have been dispelled if jurors credited Officer Jones's or Officer Hall's testimony that Smith said, "that's for personal use." The statement the officers attributed to Smith was highly probative evidence of his intent to possess *something* that police recovered. But, as in *Fields*,

---

48. Officer Jones had acknowledged on cross-examination that nothing in the radio call about a "disorderly drug complaint" had provided him a description that matched appellant.

49. Other observations that we made in *Fields* apply here as well: "The fact that appellant was initially seen in the area where the police were responding to a drug complaint did not permit the jury to infer, much less beyond a reasonable doubt, that appellant intended to possess drugs when there was no testimony linking up appellant's presence to the complaint about drug activity," *Fields*, 952 A.2d at 869 n. 17; and appellant's conduct (here, Smith's flight and his statements to police) "would support an inference that he was conscious of guilt for *something*," but not necessarily attempted possession. *Id.* at 868–69.

50. The prosecutor argued in his opening statement that the "cell phone was a very important piece of information" that linked Smith to the gun and to the plastic bag, since half of the cell phone was found within a few feet of the gun and plastic bag and the other half was in Smith's pocket. But the credibility of Officer Jones's testimony regarding that connection was undermined at least somewhat by the fact that, on the PD–81 report, he made no mention of any items having been found on Smith's person. Officer Jones's testimony about finding a digital scale on Smith's person was undermined for the same reason. In addition, in his closing argument, defense counsel pointed out that the government's photographic evidence did not include a picture of a scale.

"appellant did not concede the fact from which the jury could have inferred that he attempted to possess" an unlawful substance. *Fields*, 952 A.2d at 868. To the contrary, in his opening argument, defense counsel said, "Mr. Smith did not make the statements." In addition, defense counsel elicited testimony that Officer Jones made no notes about Smith's statement "for personal use, not distribution" to which he testified [51] and also did not recount the statement when he first met with the prosecutor about the case. Officer Hall's testimony was not tainted in that way, but we cannot say that the statement "that's for personal use" (to which both Officer Jones and Officer Hall testified) [52] necessarily referred to the contents of the plastic bag rather than the gun.[53] It is perhaps more likely than not that the statement "that's for personal use" referred to drugs.[54] But the testimony did not indicate what Smith and Officer Jones were discussing or otherwise what the immediate context was when Smith said "that's for personal use," and, as case law demonstrates, sometimes a defendant's statement about intended "personal use" can be a reference to the defendant's reason for carrying a gun. *See United States v. Cost*, No. 99–4800, 2000 WL 1087393, \*1, 2000 U.S.App. LEXIS 18903, \*1 (4th Cir. Aug. 4, 2000) (finding no error in the district court's conclusion that defendant possessed a loaded firearm in his pants pocket both "for his

personal use" and to facilitate the commission of a drug trafficking offense, and therefore affirming the enhanced sentence that the court imposed for defendant's carrying a firearm "in connection with" a drug offense); *United States v. Washington*, 340 F.3d 222, 231 (5th Cir.2003). Thus, even assuming that the jury believed that Smith made the statement "that's for personal use," we cannot say that jurors "would have been *compelled* to find" that appellant's statement was about the plastic bag and its contents. *Fields*, 952 A.2d at 867 (italics added) (citing *Neder*, 527 U.S. at 16, 18–19, 119 S.Ct. 1827).

Finally, *Fields* bids us to consider the evidence "as the case was tried," *id.* at 865, and to consider the "likely effect of the material on the trier itself." *Brooks v. United States*, 367 A.2d 1297, 1309–10 (D.C.1976). This means that we must consider the likely effect on the jury that heard the rest of the case up to that ruling. The jury heard Officer Jones's explanation that the plastic bag containing the rock-like substance was sent to the DEA for testing. If the DEA–7 report had not been admitted, the jury would have been left to wonder why there was no DEA confirmation that the plastic bag contained drugs. From the absence of such a confirmation, they might have drawn an adverse inference that the contents were

---

**51.** Officer Jones prepared the *Gerstein* statement as well as the PD–81.

**52.** Notably, in his closing argument, the prosecutor reminded the jury that Smith's statement was "that's for personal use," thus emphasizing the words that both officers heard.

**53.** One version of Smith's statement to which Officer Jones testified—"that's for personal use, not distribution"—seems clearly to be a reference to drugs, but the version of the statement on which both officers agreed was the truncated "That's for personal use." The

statement conceivably referred to the cell phone, but this appears much less likely.

**54.** That is how the trial judge understood the statement. Judge Retchin commented that the statement "shows evidence that the possessor likely had a guilty mind about distribution." *Cf. Carpenter v. State*, 668 P.2d 347, 349 (Okla.Crim.App.1983) (emphasizing the probative value of appellant's admission, during a police search, that marijuana uncovered by an officer was "for personal use").

not drugs.[55] That inference would not, as a matter of law, have precluded the jury from finding *intent* to possess, but we think it would have made a conviction for intent to possess less likely. In other words, "a reasonable jury might have received a significantly different impression of the government's case had the DEA–7 report not been admitted." *Fields,* 952 A.2d at 866 (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

In light of all the foregoing, "we are not confident that the lesser-included attempt offense would not have been affected by the DEA–7 chemist's report." *Doreus,* 964 A.2d at 160. Accordingly, we will not direct entry of a judgment of conviction for attempted possession.

2. *The Gun and Ammunition Convictions*

Next, we analyze the impact of the erroneous admission of the DEA–7 report on Smith's convictions on the three gun-related charges (CPWL, UF and UA). Although the DEA–7 was not used to prove an element of CPWL, UF or UA, we must consider whether there is a "reasonable possibility" that its admission "affected the jury's verdicts on [these] counts of the indictment," *Morten v. United States,* 856 A.2d 595, 597 (D.C.2004), and "contributed to [Smith's] conviction[s]" for these crimes. *Chapman,* 386 U.S. at 24, 87 S.Ct. 824.

■ Even though the government did not charge Smith with distribution or intent to distribute, the government's apparent theory of the case was that he was an armed and dangerous drug-dealer. In opening argument, the prosecutor told the jury that, on a "typical night" in a particular "open air drug market," Smith "possess[ed] a large caliber handgun, fully loaded ... a digital scale ... *a large quantity of crack cocaine,* [and] a cell phone" (emphasis added), which the prosecutor described as the "tools of the trade." In his closing remarks, the prosecutor twice reminded the jury that Smith was "in a housing area with a fully loaded firearm, *with several hundred dollars worth of ... cocaine* [and] a digital scale [and] cell phone" (emphasis added). Thus, although the prosecutor did not expressly argue that the jury could infer that the gun belonged to Smith upon concluding that the plastic bag of drugs belonged to him, the prosecutor's narrative made a connection between the high-value of the drugs and drug paraphernalia and the loaded gun.[56] We have little doubt that the DEA's analysis that confirmed that the substance in the plastic bag actually was 84% cocaine, and that enabled Detective Washington to discuss the street value of the high-quality drugs, provided evidence with which the jury could link Smith to the gun if it found that the plastic bag belonged to him.

Our task, however, is to "determine on the basis of our own reading of the record and on what seems to us to have been the probable impact ... on the minds of an average jury, ... whether [the improperly admitted evidence was] sufficiently prejudicial to petitioner as to require reversal." *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) (citation and internal quotation marks omitted). The question we must grapple with here is

---

**55.** This is not to suggest that the defense would have been entitled to a missing evidence instruction. *Cf. Doreus v. United States,* 964 A.2d 154, 162 n. 11 (D.C.2009) (Glickman, J., concurring).

**56.** *See Morten,* 856 A.2d at 602 ("A prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudicial").

whether the testimony about Smith's spontaneous identification of the .41 Magnum was such overwhelming evidence of Smith's connection to the gun that it dissipated any effect of the erroneously admitted DEA–7. To answer this question, we must consider the overall strength of the prosecution's case on the gun and ammunition charges and the importance of the DEA–7 evidence in the prosecution's case, including whether the DEA–7–related evidence was cumulative and the degree to which it was corroborated by admissible evidence. *See Delaware v. Van Arsdall,* *supra,* 475 U.S. at 684, 106 S.Ct. 1431; *Lewis v. United States,* 483 A.2d 1125, 1135 (D.C.1984) (admission of statement obtained in violation of *Miranda* was harmless beyond a reasonable doubt because substance of statement was presented to jury through other, untainted testimony); *cf. McCoy, supra* note 46, 890 A.2d at 208–09 ("we use a 'cumulative' test: if the content of the improperly admitted confession is replicated *in toto* by other evidence, then the error is harmless").

Both Officer Hall and Officer Jones testified to Smith's statement, "that's for personal use" and to Smith's spontaneous identification of the .41 Magnum—apparently, a rare type of handgun. These statements drew a powerful connection (1) between Smith and an item found in the mulch, and, in particular, (2) between Smith and the (unusual) gun—establishing that Smith both knew about and meant to exercise control over the weapon and the bullets it contained. Officer Jones's credibility was undermined at least somewhat by his failure to make a note of these statements when he papered the case and first spoke with the prosecutor and by his mistake in saying that Smith blurted out his statement about the .41 Magnum when a radio dispatcher asked about the gun.[57] But, as the prosecutor stressed in his closing, Officer Hall was not effectively impeached.[58] Additionally, Officer Hall testified that, upon hearing Smith say that the gun was a .41 Magnum, Officer Jones said, "There's no such thing as a 41 Magnum; you mean a 44." In describing this exchange, Officer Hall supplied detail that not only strengthened the credibility of his own testimony that Smith expressly identified the weapon, but also corroborated Officer Jones's statement that he (Officer Jones) responded to Smith's statement about the gun by saying "he was lying; there is no such thing as a .41 caliber."

We are mindful that, during the trial, jurors submitted written questions about the gun and ammunition. One juror asked whether "physical evidence was obtained from the side arm and/or ammunition" and, if so, whether it "form[ed] a direct connection between the side arm and ammunition and the defendant." Another juror asked, less specifically, whether police took fingerprints and another similarly asked whether Smith's fingerprints were found on any of the items that police recovered.[59] However, these questions came during the testimony of a witness, Officer Ruiz, who described his work on the scene as part of the "forensic science division, crime scene search unit" that was responsible for "collecting evidence." During his

---

**57.** *See Fields,* 952 A.2d at 867 (indicating that the erroneous admission of evidence for the government is not harmless where the other evidence supporting the government's case is vulnerable to impeachment); *Blunt v. United States,* 863 A.2d 828, 836–837 (D.C.2004) (same).

**58.** Defense counsel's questioning of Officer Hall focused on Officer Hall having made no record of reading Smith his rights.

**59.** The court responded by instructing the jury that the government "is under no duty to conduct fingerprint tests."

direct testimony, Officer Ruiz had mentioned taking photographs and taking the gun and other items into evidence. On cross-examination, defense counsel asked whether as a crime scene search officer, Officer Ruiz also "take[s] fingerprints." It was thereafter when the trial judge stated that there were written questions from the jurors. In this context, we think the jurors' questions show no more than that the jurors were appropriately curious. We do not regard the questions as indicating that the other evidence that had been presented at that point-including the statement about the .41 Magnum—was weak, or left jurors unpersuaded about the link between Smith and the gun. *Cf. Flores v. State,* 114 Nev. 910, 965 P.2d 901, 903 (1998) ("A proper question [during jury-questioning] does not imply that a juror [has] formed any opinion any more than it does when a judge asks a question"); *State v. Davis,* No. 97PA08–1020,1998 Ohio App. LEXIS 2210, *6 (Ohio Ct.App., May 19, 1998) (reasoning that two jurors' questions to a bailiff about defendant's imprisonment status did not show that they had pre-judged his guilt, but revealed only that they were curious).

"Judicious application of the [*Chapman*] harmless-error rule does not require that we indulge assumptions of irrational jury behavior . . . ." *Schneble, supra,* 405 U.S. at 431–32, 92 S.Ct. 1056. We "conclude that the 'minds of an average jury' would not have found the [government's] case significantly less persuasive had the [erroneously admitted DEA–7 evidence] admissions been excluded," and thus we will not disturb the judgments of conviction as to the CPWL, UF, and UA charges. *Id.* at 432, 92 S.Ct. 1056.

### Conclusion

For the foregoing reasons, we reverse appellant's judgment of conviction for possession of cocaine. We reject the government's request that we remand for entry of judgment on the lesser-included offense of attempted possession. We affirm the CPWL, UF and UA convictions.

*So ordered.*