*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 11-CF-134

BOBBY JOHNSON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-15607-09)

(Hon. Michael L. Rankin, Trial Judge)

(Argued October 24, 2014                    Decided January 29, 2015)

*Erek L. Barron* for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *John Truong*, and *Magdalena Acevedo*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and EASTERLY, *Associate Judges*, and NEBEKER, *Senior Judge*.

Dissenting opinion by *Associate Judge* EASTERLY at page 15.

NEBEKER, *Senior Judge*:  Appellant Bobby Johnson appeals his jury convictions of assault with a dangerous weapon ("ADW"), aggravated assault while armed ("AAWA"), mayhem while armed ("MWA"), unlawful possession of

a firearm ("UPF"), carrying a pistol without a license ("CPWL"), possession of an unregistered firearm ("UF"), unlawful possession of ammunition ("UA"), and three counts of possession of a firearm during a crime of violence ("PFCV"). Appellant presents two arguments on appeal. First, appellant contends that either the trial court failed to make a *Batson* finding that the government's peremptory strikes were not the result of purposeful discrimination or the trial court's *Batson* finding of no purposeful discrimination was clearly erroneous. Second, appellant contends that some of his convictions merge. We affirm appellant's convictions, and remand for the trial court to merge the appropriate offenses and resentence appellant consistent with this opinion.

**I.**

The underlying charges stem from the following factual scenario. At the time of the shooting, the victim was scheduled to testify at trial against appellant's brother, Jonathan "Bow Wow" Johnson. On his way to play basketball on July 15, 2009, the victim walked around a corner and saw appellant. "I just looked at him and then that's when he must have saw me, and he was like, what's up, homey, and then immediately he whipped out [a gun] and just started shooting." "[T]he first ones I felt was in my butt. And then once I got shot in my right leg, I ain't feel no

more.  I just felt me trying to drag myself behind -- on the side of the building."

The victim sustained several injuries.  One bullet "lacerated the rectum, and it had gone in and there are several blood vessels in this area which were bleeding."  The victim still used a colostomy bag at trial.  In addition, a bullet fractured the victim's right knee and tibia, causing mobility problems that persisted until at least the date of trial.  The victim stated that his leg "was never going to be like God intended it to be" and that he would need to undergo further operations to save his leg.

During *voir dire*, the court asked several questions of each juror and both appellant and the government were offered an opportunity to ask follow up questions.  Following *voir dire*, the government used peremptory strikes on jurors number 018 and 442, two African American males.  The trial court had questioned these jurors during *voir dire*, but the government did not ask them additional questions.  The trial court *sua sponte* pressed the government for a race-neutral explanation for the strikes:

> THE COURT:  Would counsel approach the bench.
> (Bench conference.)
> THE COURT:  I want the government to explain these
> two strikes, juror 442 and juror 018.

MS. ACEVEDO: 442 is the older man, I thought he was very soft spoken and I thought that he would get pushed around in a jury.

THE COURT: That doesn't pass muster.

MS. ACEVEDO: That he's soft spoken? To me he seems like somebody who would not - - who would not express himself and could get pushed around by other jurors.

THE COURT: What about the other one?

MR. TRUONG: Your Honor, that gentleman because - - similar reason, given his youth, we have to believe that he'd not be an assertive member of the jury if he has an opinion or given the fact that he's inexperienced in his youth, and we are concerned that he may not have the confidence to voice his views during deliberation.

THE COURT: Let me ask you a question: Did it occur to either one of you to ask either of those jurors questions going to that? I mean, we had him up here. If that was a concern, could you have asked some kind of question about that?

MS. ACEVEDO: It is our experience, Your Honor, jurors don't admit that they would be.

THE COURT: But you could see his reaction, sort of like cross-examination, people don't confess but you ask them questions that would allow you to draw reasonable inferences.

MR. TRUONG: We thought the Court's questioning of both jurors gave us enough - - we thought that the Court's questioning of both jurors give enough information to form an opinion whether we would like them to be on the jury.

My impression of 018 was that he was kind of shy, and coupled with the fact that he - - his age and my concern that he's not forceful in expressing his views if there is a vigorous deliberation of the facts.

THE COURT: I guess that I could see that in the way he answered the questions. I don't think I see any of that in the way the older man answered those questions. I don't get that at all.

What did he say? Did you make any notes on him?

MS. ACEVEDO:  Yes, Your Honor, my notes for him was that he was soft spoken.  His tone of voice was very quiet.  He didn't seem like - -

THE COURT:  So you like screamers, you like yellers?

MS. ACEVEDO:  Not screamers, Your Honor, but I believe jurors have to be very willing to express their opinions, and he didn't - - based upon his - - in his gentle manner, he didn't seem like somebody who would.

MR. TRUONG:  The concern is not only expressing their opinion, but to defend it also.

THE COURT:  All right.  I want you to know that I'm going to have a keen eye going forward.  We get panels that don't necessarily have a lot of black males to start with, and if you start striking black males because they're soft spoken, it raises my eyebrow.  All right.

Do you have anything on this?

MR. MCCANTS:  Just, we want to make a challenge, and we felt as if the government has targeted black males.  Striking the only two black males in the jury.  Without articulating any unbiased reason.

THE COURT:  Well, I think that they - - I think that's exactly what I asked them to do, and I believe they did articulate non-race based reasons.  I guess it's not my job to agree with them or disagree with them but to listen and see whether the reason is based on anything that the jurors said or any behavior that the juror demonstrated, so I'd have to say at this point that it does not raise to the level of a legitimate challenge, but my antenna is definitely up.

Let's go forward.

(End of bench conference.)

After trial, the court sentenced appellant to an aggregate sentence of 336 months' incarceration.  The sentences for PFCV, AAWA, and UPF are consecutive as to each count, while the sentences for the remaining charges are concurrent as to

each count and with AAWA.  Appellant timely appealed.


## II.


Appellant argues that the trial court did not properly conduct the *Batson* analysis.  At oral argument, appellant contended that the trial court did not (as it should have) make a factual finding determining whether the strikes of the jurors were a result of purposeful discrimination.  In his brief, appellant suggests that, if there was such a finding, it was clearly erroneous.  We disagree with both arguments.


## A.  The *Batson* Framework


*Batson* requires a three-part inquiry into whether the prosecutor engaged in purposeful discrimination while using a peremptory strike.

> [O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two).  If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

*Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam). Although the burden of producing evidence shifts during this inquiry, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id*. at 768.

## B.  The Trial Court's Ruling

The trial court's comments must be read in the context of this three-step process. The court's initial reaction was to state that the government's explanation for striking juror number 442 "doesn't pass muster." Appellant contends that this statement constitutes a factual finding of purposeful discrimination, but it is important to recognize that it was made at the outset of the inquiry, not at step three of the analysis. After this comment was made, the court and the prosecutors engaged in a long discussion, and the court ultimately concluded that the reasons given by the prosecutors did indeed "pass muster," in the sense that they were "non-race based reasons."

When defense counsel asserted that the prosecutors had not articulated "any unbiased reason" for striking the two jurors, the trial court responded:

> I believe they did articulate non-race based reasons. I guess it's not my job to agree with them or disagree with them but to listen and see whether the reason is based on anything that the jurors said or any behavior that the juror demonstrated, so I'd have to say at this point that it does not raise to the level of a legitimate challenge. . . .

The judge's analysis properly recognized that, at step two of the *Batson* inquiry, it was not his "job to agree . . . or disagree with" the prosecutors' strategy for exercising peremptory strikes. "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett*, *supra*, 514 U.S. at 767-68). Although the trial judge quickly moved from step two to step three of the inquiry, he clearly held that the prosecutors had satisfied step two by "articulat[ing] non-race based reasons."

The court then focused on step three of the *Batson* procedure to determine whether appellant had carried his burden of proving that the prosecutors were engaged in purposeful racial discrimination when exercising their peremptory strikes. At this stage, "the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's

demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). The court echoed these principles by commenting that its job was "to listen and see whether the reason is based on anything that the jurors said or any behavior that the juror demonstrated . . . ." His ultimate assessment was: "I'd have to say at this point that it does not raise to the level of a legitimate challenge . . . ." Considered in context, this conclusion is properly interpreted as a ruling on stage three of the *Batson* process.

## C.  Legal Analysis

Only the third step of the analysis is challenged on appeal.  Because the prosecutors gave reasons for their strikes, the existence of a prima facie case is moot, *see Epps v. United States*, 683 A.2d 749, 752 (D.C. 1996), and appellant concedes that "the government did articulate a race and gender-neutral reason for each strike."  This court's case law does not specifically address whether being soft spoken or non-assertive are qualities that survive step two of a *Batson* challenge, but many courts have held that they do.  *E.g.*, *People v. English*, 988 N.Y.S.2d 697, 699 (App. Div. 2014) (soft spoken); *State v. Carroll*, 34 S.W.3d 317, 320 (Tenn. Crim. App. 2000) (non-assertive); *Magee v. State*, 994 S.W.2d 878, 889 (Tex. Ct.

App. 1999) (soft spoken). We hold today that being soft spoken or non-assertive are both race-neutral explanations for a peremptory strike.

For the reasons already stated, we reject appellant's argument that the trial court failed to make a ruling on the issue of purposeful discrimination. We now turn to appellant's attack upon the finding that was made.

"[A] trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Smith v. United States*, 966 A.2d 367, 377 (D.C. 2009) (quoting *Snyder*, *supra*, 552 U.S. at 477). "[The Supreme Court has] recognized that these determinations of credibility and demeanor lie 'peculiarly within a trial judge's province'. . . ." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) [hereinafter "*Miller-El I*"] (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality)). This evaluation of the third part of *Batson* is made "in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) [hereinafter "*Miller-El II*"]. The trial court, however, is not required to make detailed findings of fact or to give a detailed explanation following a *Batson* challenge. *Miller-El I*, *supra*, 537 U.S. at 347; *Smith*, *supra*, 966 A.2d at 375; *see Hernandez*, *supra*, 500 U.S. at 369-70, 372.

The trial court observed the prosecutor and the jurors, and used these observations to make the finding quoted above. Given that the trial court is not required to make detailed factual findings, we hold that the trial court's explanation is sufficient to satisfy the third part of *Batson*.

Appellant contends that the trial court clearly erred in finding the race-neutral explanations credible because the prosecution did not ask the two African American male jurors questions during *voir dire*. This court rejected a very similar objection in *Jefferson v. United States*, 631 A.2d 13, 16 (D.C. 1993) (rejecting an objection when the prosecution "excluded a black male who had not answered a single question during *voir dire*"). Since the trial court asked questions of these two jurors, could observe their responses first hand, and *sua sponte* pressed the prosecutors for more detailed explanations about why they wanted to strike these two jurors, the trial court was in the best position to make these critical credibility determinations.[1]

---

[1] Appellant does not contend that this case was racially charged, so that the attorneys might have a motive to focus on the race of the jurors. In addition, the overall pattern of peremptory challenges and the composition of the resulting jury do not raise any red flags. The government used peremptory strikes on two black males, one white male, four black females, and three white females. Appellant used peremptory strikes on no black males, two white males, one Asian male, two black females, three white females, and one Indian female. The final jury included twelve females and two males, but data revealing racial composition is not

(continued…)

Considering all of the circumstances presented, we are not persuaded that the trial court's finding of no purposeful discrimination was clearly erroneous.

**III.**

Appellant argues that his convictions merge since they were companion offenses stemming from the same transaction. Both appellant and the government agree that some offenses merge, but they disagree about whether AAWA and PFCV merge. In addition, the parties do not agree on whether this court should just vacate the merged offenses on appeal, or remand with instructions to merge the appropriate offenses and to resentence appellant.

First, appellant contends that ADW, MWA, and PFCV should merge with the AAWA, leaving a single offense. The government contends that merger is appropriate but that appellant would be left with two offenses, AAWA and PFCV. Both parties and our case law are in agreement that ADW, MWA, and AAWA merge. *Nero v. United States*, 73 A.3d 153, 160 (D.C. 2013). As such, this court's

---

 (…continued)
available.

analysis will focus on whether the PFCV merges with AAWA. These two offenses do not merge.

The Fifth Amendment Double Jeopardy Clause prohibits "multiple punishments for the same offense." *Whalen v. United States*, 445 U.S. 684, 688, (1980) (internal quotation omitted). When considering whether two offenses stemming from the same act merge, we evaluate whether each offense "requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). It is well established in this court's precedent that the "Council of the District of Columbia did not intend for the offense defined by 3204(b) [PFCV] to merge with an offense subject to the enhanced penalty provision of 3202 [now located at D.C. Code § 22-4502 (2012 Repl.)] for committing an underlying offense while armed." *Hanna v. United States*, 666 A.2d 845, 856 (D.C. 1995) (internal quotation omitted). In this case, the underlying offense while armed is AAWA—aggravated assault subject to the enhanced penalty provision of D.C. Code § 22-4502. As such, we find that the PFCV does not merge with the underlying offense, AAWA.

The government asks this court to vacate certain merged crimes without remanding, or in the alternative, to remand to the trial court to resentence

appellant. As cited by the government, this court in *Thorne* remanded for resentencing when it vacated one of defendant's two concurrent burglary sentences, thus "permit[ting] the trial court to effectuate its original sentencing plan." *Thorne v. United States*, 471 A.2d 247, 249 (D.C. 1983). We agree that a remand is appropriate here.[2]

## IV.

This court affirms appellant's convictions, and remands for the trial court to merge the appropriate offenses and resentence appellant consistent with this opinion.

*So ordered.*

---

[2] Appellant's argument that the MWA conviction was not supported by sufficient evidence is moot because, on remand, appellant's MWA conviction will merge with appellant's AAWA conviction.

EASTERLY, *Associate Judge*, dissenting: Juror number 442 was a fourteen-year veteran of the United States Army. He was also African-American. When the government sought to use its fifth and sixth peremptory strikes against him and another African American, juror number 18, the trial court asked for an explanation. The government had already used three of its first four peremptory strikes to remove African Americans from the petit jury. The government gave a race-neutral explanation for striking juror number 442, namely: "[H]e was very soft[-]spoken and I thought he would get pushed around in a jury." The trial court did not credit this explanation and immediately informed the prosecutor: "That doesn't pass muster." The court subsequently reiterated that, although the government's concern might have been legitimate with respect to juror number 18, for whom the government had offered a "similar reason" based on his "youth,"[1] the court did not "see any of that in the way the older man answered th[e voir dire] questions," declaring: "I don't get that at all."

---

[1] Regarding juror number 18, the government expressed concern that "he'd not be an assertive member of the jury if he has an opinion or given the fact that he's inexperienced in his youth . . . he may not have the confidence to voice his views during deliberation." However, the government never asked juror number 18 his age, and the record reflects that the government did not seek to strike two other youthful jurors who were seated on the jury: juror number 446, who was one year out of high school and whose youthful appearance prompted the trial court to observe that he "looked a lot younger than that"; and juror number 28, who was a sophomore in college.

At this point in the proceedings, the court had all the information that a *Batson* inquiry[2] is supposed to provide: The court had been given a reason by the government for the exercise of a questionable peremptory strike and the court had determined that this reason was not credible. The only conclusion for the court to draw at that point was that the government had improperly struck juror number 442 on the basis of his race. It was thus error for the court not to reseat juror number 442, and we must reverse.[3]

My colleagues in the majority assert, however, that all discussion up to this point in the proceedings was part of a step-two analysis of whether the government had properly provided a non-race-based reason, and that, as to step three, the

_____

[2] A challenge under *Batson v. Kentucky*, 476 U.S. 79 (1985), generally has three steps: (1) defense counsel must make a prima facie "showing that the totality of relevant facts gives rise to an inference of discriminatory purpose," (2) the government must then "come forward with a neutral explanation that is related to the particular case to be tried," and (3) the court must determine if "the explanation given [by the government] is a pretext for discrimination." *Smith v. United States*, 966 A.2d 367, 374 (D.C. 2009), *as amended on reh'g* (May 14, 2009) (internal quotation marks omitted); *see Robinson v. United States*, 878 A.2d 1273, 1282 (D.C. 2005). Here, because the court *sua sponte* questioned the government's use of peremptory strikes—as it had full authority to do, *see Owens-Corning Fiberglas Corp. v. Henkel*, 689 A.2d 1224, 1228 n.8 (D.C. 1997)—the *Batson* inquiry reduced to the government's proffer of a non-race-based reason for the exercise of its peremptory strike and the court's evaluation of that reason.

[3] *Smith*, 966 A.2d at 369 ("[R]ecognizing that [appellant] would be entitled to reversal . . . if the record establishes that race was a consideration in the prosecutor's decision to strike even one African American juror." (citing *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008))).

court's "ultimate assessment" was that there was no legitimate *Batson* challenge. I cannot agree.

To begin with, the preceding discussion did not merely address the second step of the *Batson* inquiry; the court went beyond discerning whether the government's reason was race-neutral to the third step and assessed whether the reason was, in fact, credible. *Cf. Smith v. United States*, 966 A.2d 367, 374 (D.C. 2009) (explaining that "the second step of [*Batson*] does not demand an explanation that is persuasive or even plausible" (internal quotation marks omitted)); *United States v. Evans*, 192 F.3d 698, 701 (7th Cir. 1999) (noting that "[a]ny neutral reason, no matter how implausible or fantastic, even if it is silly or superstitious, is sufficient" to satisfy step two of a *Batson* analysis (internal quotation marks omitted)). As noted above, the court said it did not see what the government had seen in the juror, and then asked the government if it had made "any notes" on juror number 442. The government could only repeat that its notes reflected that he was "soft[-]spoken. His tone of voice was very quiet." The court did not seem impressed with this answer, rhetorically inquiring, "So you like screamers, you like yellers?" Then the government explained that the concern was that the juror would be unwilling to express and defend his opinions. This

dialogue is clearly focused on whether the government's non-race-based reason was pretextual.

Moreover, this dialogue clearly demonstrates that the court still believed that the government's justification did not "pass muster." Indeed the court had been given no good reason by the government to reconsider its earlier negative assessment of the government's proffered reason for its decision to strike juror number 442. Beyond the assertion that juror 442 was "soft-spoken," which the trial court rejected, the court had been given no foundation in anything juror 442 had said or done for the government's peremptory strike.

My colleagues determine that the court must have reconsidered its assessment of the government's proffer by pointing to the court's final statement on the subject: "[A]t this point . . . it does not raise to the level of a legitimate challenge." But the court's explanation for that conclusion is precisely what is so troublesome about this case. The court stated that it "believe[d] the[] [government] did articulate non-race based reasons [for the peremptory strike]"—which is clearly correct, but not the ultimate issue. See *supra* note 2. The determinative question was whether the government had used a supposed demeanor observation as a pretextual basis for a racially motivated peremptory strike. *See Smith*, 966

A.2d at 383 (explaining that demeanor observations "must be closely scrutinized because they are subjective and can easily be used by a prosecutor as a pretext for excluding persons on the basis of race" (internal quotation marks omitted)). As to this question, the court, in the end, punted, stating: "I guess it's not my job to agree with them or disagree with them but to listen and see whether the reason is based on anything that the jurors said or any behavior that the juror demonstrated."

It *was* the court's job to assess not merely whether there was any evidentiary support in the record for the government's explanation for decision to strike juror number 442, but also whether the government's non-race-based reason for its peremptory challenge was credible. In the third step of the *Batson* inquiry, "the trial court *must* decide whether the defendant has proved purposeful racial or gender discrimination. The resolution of this factual question 'comes down to whether the trial court finds the prosecutor's race-neutral [and gender-neutral] explanations to be credible' or pretextual in light of all the relevant evidence." *Robinson v. United States*, 878 A.2d 1273, 1282 (D.C. 2005) (emphasis added) (citation omitted) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003)); *accord*, *Smith*, 966 A.2d at 375. Here the court had determined that the government's explanation for its use of a peremptory challenge to strike juror number 442 was not credible, but it nonetheless let this strike stand and told the

government only that it was going to "have a keen eye going forward." This was error.

*Batson* does not allow for one free pass. "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder*, 552 U.S. at 478 (cited favorably in *Smith*, 966 A.2d at 369). We have previously acknowledged that "unless the trial court rigorously scrutinizes the prosecutor's race-neutral explanations, *Batson*'s promise of eliminating racial discrimination in jury selection will be an empty one." *Smith*, 966 A.2d at 376 (quoting *Tursio v. United States*, 634 A.2d 1205, 1211 (D.C. 1993)). The same holds true if a trial court scrutinizes the government's explanation for a peremptory challenge, finds it wanting, but then takes no action.